UNITED STATES of America, Plaintiff,

v.

The O. M. SCOTT & SONS COMPANY, Defendant.

Civ. A. No. 760–64.

United States District Court District of Columbia.

Aug. 8, 1969.

---

Charles R. Esherick, William B. Slowey, Dept. of Justice, Washington, D. C., for plaintiff, United States.

John W. Christensen, Richard Brentlinger, Gingher & Christensen, Columbus, Ohio, Thomas A. Rothwell, New York City, Strauch, Nolan & Neale, Washington, D. C., for defendant, The O. M. Scott & Sons Co.

HART, District Judge.

## NATURE OF ACTION

The plaintiff in this action is the United States of America.

The defendant, the The O. M. Scott & Sons Company, is an Ohio corporation with its principal offices at Marysville, Ohio.

Defendant is one of the largest manufacturers and distributors of lawn care products in the United States.

Plaintiff contends that during the period January 1, 1959, to March 30, 1964, the defendant acted unlawfully to maintain prices in so-called non-fair trade states and in the District of Columbia.

## FINDINGS OF FACT

This action was filed March 30, 1964, and complains of alleged illegal acts by defendant, beginning in or about the year 1959. Consideration of alleged illegal actions by the defendant is limited to the period January 1, 1959, to March 30, 1964. However, these findings will not be limited to that period since evidence was adduced covering defendant's operations over a period of 100 years and it is necessary to consider this entire period to understand the philosophy of and the reasons for defendant's operations in selling during the relative brief period complained of.

1. A young farmer, O. M. Scott, returned to his farm in Union County, Ohio, near Marysville, Ohio, after service in the Union Army during the War Between the States. About 1869, this young War Veteran had determined that, due to the unavailability of clean farm or pasture grass seed, particularly seed that was free from weeds, that there was an opportunity to raise, process and sell such seed. Mr. Scott began, on a small scale, to sell this clean and relatively weed-free farm seed to his farm neighbors in Union County, Ohio. Mr. Scott also pioneered in the practice of testing his seed to insure that the seed he sold to his neighbors was viable and thus would grow when planted.

2. Mr. Scott's grass seed business grew slowly, but steadily, after 1869, with one farmer telling another farmer of the merits of Scott seed, until in the latter part of the nineteenth century, the Scotts were selling seed directly to farmers not only in Ohio but also in Michigan, Pennsylvania and other nearby States.

3. In the early part of the twentieth century the Scotts were also interested in promoting the use of farm machinery. By this time Mr. Dwight Scott, a son of the founder, was in substantial charge of the business and he saw the opportunity to serve an expanding home market. Up to this time the Scott seed had been of primary use to farmers for use in pastures and grazing lands. The non-farm public had no real access to a quality seed for lawns. Dwight Scott started to package a quality lawn seed, and, in about 1912, this quality lawn seed was offered for sale directly to the home consumer market by small space advertising in magazines of fairly wide circulation.

4. In the early 1920s Mr. Charles P. Mills, who had been hired by the Scotts as an office boy in 1912, toured Germany for Scotts and found a particular type of seed suitable for golf courses, called "Bent Grass." This seed proved to be a most desirable species for use on golf putting greens. A substantial amount of the Bent Grass seed was obtained and Scott promoted the sale of this seed, by mail, to golf courses and other large users. Scott also undertook to expand the lawn seed business by a more aggressive direct-mail selling effort.

5. In the beginning of 1925, Scott's sales consisted entirely of direct sale by mail to consumers or users. In 1925, a shipment of Scotts products was made to the J. L. Hudson Co. of Detroit, Michigan, a department store, for resale by it. This came about as a result of grass seed shipped by mail to one of the officers of the Hudson Co. for use on his own estate and, this officer, being pleased with the results he obtained, asked that his store be allowed to offer the seed for sale in their Houseware Department.

6. In August, 1928, the first edition of "Lawn Care" was published by Scott. At that time Scott was handling a large volume of correspondence and telephone calls from consumers seeking advice on their lawns. Scott felt that, in view of this volume of correspondence and calls, the matter could better be handled by a regular publication giving information and advice on proper lawn care. The first issue of "Lawn Care" was sent to approximately 5,000 users who had purchased Scott seed.

In the first edition of Lawn Care the purpose for its publication was stated as follows:

"To pass along to those who are trying to maintain satisfactory lawns the experience of experts and amateurs."

Included in this edition was a short article recommending the sowing of grass seed in the Fall rather than in the Spring, as was the habit of the times, and articles relating to seed mixtures, weeds and English lawns. While the first edition of Lawn Care contained no pricing information, it was accompanied by a sales letter soliciting orders and stating prices when it was mailed to the users.

7. In the year 1928, Scott entered the lawn fertilizer field. Up to that time home owners had available to them only different versions of farm-type fertilizers, primarily designed to produce a one-season crop. Scott, after conferring with representatives of the United States Department of Agriculture, decided to produce a fertilizer designed for the need of grass for continued feeding. "Turf Builder" was the resulting product. Scott advertised and discussed its new product in the August, 1928, issue of Lawn Care.

8. From 1925 to 1932 Scott's merchandising methods underwent a slow but steady change. At the beginning of 1925 Scott's only method of selling was directly to users by the so-called mail-order method. The product was packaged in muslin or burlap bags in quantities from 5 lbs. to 100 lbs. While the bags contained instructions as to use printed thereon, there was no price information on the bags.

By 1932 Scott was also marketing a lawn fertilizer, Turf-Builder, and a 2-wheeled mechanical contrivance designed

to spread seed and fertilizer evenly on a lawn.

At this time Scott had progressed in the long, slow process that would eventually lead to a complete change in its method of merchandising. Scott's experience with J. L. Hudson Co. in 1925 has led Scott, almost against its will, into marketing through a slowly expanding network of retail outlets, primarily department stores but with a few hardware and florist outlets. In 1932 the bulk of Scott's sales was still directly to users on mail orders.

9. In 1932 Scott first made a determined effort to solicit dealers for its products. From the days of its founder, Scott had felt that service and instruction were essential ingredients in the sales and growth of its business, due to the nature of its products. The products sold by Scott were sold essentially on a seasonal basis, at that time in the Spring, and its primary product, seed, was viable for only one season.

In view of the foregoing, Scott, in choosing dealers, took into consideration the following:

1. Dealers who had veteran clerks, willing and able to instruct potential users of Scott's products;

2. Dealers patronized by lower to middle-class home-owners;

3. Dealers who would deliver;

4. Dealers who would charge accounts to their customers;

5. Dealers who would advertise Scott's products in connection with their own general advertising.

10. It was in 1933 that Scott first began to "pre-ticket" its products, that is, to put a retail price physically on each of its products, either by printing the price on the package containing the product, as in seed or fertilizer, or by printing the price on a ticket attached to the product, as in a spreader. The price so stated has never been modified by the words "suggested price" or similar words.

11. From 1933 to 1950 Scott continued its slow but steady growth. During this period the emphasis on distribution was being shifted little by little, but steadily, from mail-order distribution to dealer distribution.

12. In the early 1940s Scott undertook, formalized and developed a research program that has since become an important aspect of its operations. Scott obtained the services of a "Neisi" who had been "relocated" from the West Coast. This man was a Ph.D. whose specialty was entomology. The Doctor set in motion a program of research which resulted in important discoveries in Scott's field, as follows:

1. 1947—a product combining a fertilizer with weed-control, so that the user with one application could feed his grass and kill dandelions, plantain and other weeds.

2. 1949—a product, "SCUTL," which killed crabgrass, the bane of all lawn tenders.

The foregoing discoveries gave considerable impetus to Scotts sales following the War and in the early 1950s.

13. By the middle 1950s Scott had almost completely terminated its mail-order business and its sales were being made to users through retail outlets. Scott has at no time during its long life sold through wholesalers.

Scott's original retail outlet in 1925 was a department store. Over the years, to the middle 1950s, Scotts retail outlets had expanded to include the following principal types of outlets:

1. Hardware stores;

2. Department stores;

3. Florists;

4. Drug Stores;

5. Garden Centers (largely a post-World War II development)

6. Miscellaneous (e. g., S. S. Pierce-Boston, Macy's-New York)

14. In 1938, Scott entered into its first Fair Trade contract. It was with Macy's in New York. By the middle of the 1950s, it was Scott's policy to enter into Fair Trade agreements with all of its dealers in Fair Trade states. Scott did not and does not enter into Fair Trade agreements with its dealers in non-fair trade states (District of Columbia, Missouri, Texas, Vermont, Utah (since 1956), Nebraska (since 1959), Montana (since 1961), Wyoming (since 1962), Kansas (since 1963).

The above practice as to Fair Trade agreements has continued from the middle 1950s to date.

15. Prior to 1955, Scott had no formal selling organization. Its dealers had been selected on a service-oriented basis from persons or companies writing to Scott with requests for dealerships, and as a result of corporate executives of Scott calling on retail stores in various locations while on occasional trips.

In approximately 1955 Scott decided to set up a field organization. Originally, 8 or 10 people were employed in this organization and, by 1958, it had grown to more than 100.

In 1958 Scott executives became aware that very serious difficulties had developed in their field organization. These difficulties had no specific relation to price or to fair-trade or non-fair trade states. Some of these problems were as follows:

1. Retail outlets had been obtained which did not conform to Scott's previously established policies for retail outlets. These included linoleum stores, appliance stores and gas stations which could not be expected to offer service and information to users.

2. Sales force members had attempted to compel dealers to carry Scott's full line of products or to deal exclusively in Scott's products against the dealer's will and, in some instances, threatened to terminate dealerships if the dealers did not comply.

3. Some sales representatives had employed high-pressure methods to force dealers to take more of Scott's products than they wished and had threatened termination of the dealerships if orders were not increased.

Upon being made aware of the above, the President of the Company, Mr. Williams, took over direct control of the field organization and the marketing functions. Certain of the persons responsible for pressing improper sales methods were discharged and steps were instituted to educate and direct Scott's sales force into operating in a manner consonant with Scott's theory of sales and dealer relationship.

In 1958 and 1959, as a part of Scott's effort to correct certain conditions resulting from the undesirable practices which had been followed by some of the field organization over the preceding three years, Scott terminated many dealerships. These dealerships were not terminated for failure to maintain prices, but for inability of certain dealers, such as gas stations, appliance stores and linoleum stores, to meet Scott's requirements for service-oriented sales of its products. Soon after 1959 Scott had largely reduced its dealerships to its traditional types; that is, hardware stores, department stores, florists, drug stores and garden centers.

16. In 1956 and 1957 two events occurred which contributed materially to Scott's growth and also tended to cement Scott in its service-oriented sales philosophy.

In 1956 "Vigoro" was preeminent in the lawn-garden fertilizer field. It was sold largely through department stores, hardware stores and garden or nursery shops. National advertising and independent dealer effort had achieved first place in the field for this product. In 1956 Vigoro changed its distribution policies. Vigoro moved into distribution through chain and discount stores, and they cut back on their distribution centers. Their price structure was changed to favor large retailers. Vigoro soon became the subject of price wars and there were times when it was sold

by chain and discount houses at retail prices lower than the cost to small independent dealers. This so offended the small independent dealers that instead of pushing Vigoro, they began to knock it, and, in trade parlance, to "nail it to the floor."

In 1957, Scott developed a new lightweight Turf-Builder. This development by Scott, coupled with Vigoro's changed distribution policies, caused the independent dealer to push Scott's fertilizer over Vigoro to Scott's great advantage. Soon after 1957, Vigoro was no longer No. 1.

17. In 1958, Scott's products were sold through approximately 9,550 dealers, doing an annual business of approximately $21,700,000. At this time some 88% of Scott's dealers were selling less than $3,000 in Scott's products. About 59% of Scott's annual volume were sold by dealers with less than $3,000 annual sales of Scott's products.

In 1961, Scott had 355 dealers in the then non-fair trade areas, which included the District of Columbia, Missouri, Texas, Vermont, Utah and Nebraska.

In 1964, Scott had 765 retailers in non-fair trade states, which, by then, in addition to those states mentioned immediately above, included Montana, Wyoming and Kansas. These 765 retailers in non-fair trade states purchased approximately $2,000,000 in Scott's products in 1964, or 7% of Scott's total volume.

In 1968 Scott had 1,280 dealers in non-fair trade states. Of these 1,280, 438 had been Scott's dealers since 1961 and 635 had been dealers since 1964. In 1968, the non-fair trade dealers purchased approximately $4,225,000 in Scotts products, which amounted to 7% of Scott's net volume for that year.

18. At the beginning of 1959, the starting point of the period covered by the complaint, Scott had, over the years, developed a basic policy of operating and of selling its products. This policy, and the methods used to carry it out, remained essentially unchanged through March 30, 1964, the terminal point in the period covered by the complaint.

19. By 1959, Scott's policy of operation and selling was expressed with two words: "Orderly Marketing."

While the term "Orderly Marketing" is, in Scott's corporate mind, broader than mere selling policies and activities, since it includes research, development, testing, and kindred matters, it is the term as applied to selling policies and activities that we treat of here.

20. The Scott conception of "Orderly Marketing," during the period 1959–64, is best defined and set out by Scott in its Code of Relationship, dated January, 1961. This Code reads as follows:

"CODE OF RELATIONSHIP
between
SCOTTS DEALERS
and
THE O. M. SCOTT & SONS CO.
The way to mutual
prestige-progress-profit"

"I.  These benefits are assured to Scotts Dealers

1.  Generous profit margins

A 35-year record of orderly marketing has provided Scotts Dealers with generous net margins, free from mark-downs.

These generous margins will continue so that Scotts Dealers:

a) can continue to render unusual consumer services by providing advice and guidance in Scotts Lawn Programs.

b) will be able to expand their facilities to serve more and more consumers.

2.  The privilege to buy directly from Scotts

Scotts serves its Dealers on a direct basis and expects to continue to do so. Retailers officially established as Scotts Dealers are the only ones who can buy from Scotts. Scotts does not distribute through wholesalers.

3. Professional Lawn Program guidance based on Scotts Research. ·

Expert advice and information are an integral part of Scotts service to the Dealer. Through use of this service the Dealer gains prestige as an authority on lawns.

4. An ever-expanding repeat business from satisfied users of Scotts products.

The customer who attains a better lawn, because of Scotts superior products and the Dealer's sound advice, becomes a loyal and enthusiastic client, of both Scotts, and the Dealer.

"II. Performance from Dealers at point of sale

1. The Dealer is expected to provide a merchandising environment attractive to the consumer and in keeping with standards of other Scotts Dealers.

2. The Dealer is expected to do business on the basis of service rather than price. The full-profit margin suggested by Scotts standard pricing at retail is essential so that the Dealer can provide these four important services:

a) An ample and orderly arrangement of Scotts Program products proudly displayed by the Dealer as his 'badge of authority.'

b) Adequate reserve stocks to care for the seasonal and weather-influenced explosive demands for Scotts products.

c) An informed and enthusiastic sales personnel able to provide consumers with sound guidance on Scotts Lawn Programs. Scotts recognizes that this requires in-store training and shares this responsibility.

d) Uniformity of advice so the consumer is not confused. There must be no contradiction of the Scotts Lawn Program concept by implication that any one product, Scotts or otherwise, can build or maintain a good lawn.

3. The Dealer is expected to confine sales of Scotts products to consumers and to refrain from engaging in wholesale transactions or intra-dealer sales.

"III. Mutual understandings inherent in the Scotts Code

1. Scotts distributes its products to consumers through Dealers chosen by the Company. Each dealership is on an individual, direct, non-exclusive basis. Scotts maintains the right to establish a dealership with any retail store which it believes will live up to the Scotts Code of Relationship.

2. The Company will work in continuous harmony with each of its Dealers and pledges complete cooperation to those Dealers whose actions are consistent with Company policies. Scotts will not revoke a dealership without careful review by its Dealer Appraisal Committee, of which the Company president is chairman.

3. The extension of the right to purchase and sell Scotts products is individual in nature and cannot be transferred to any other retail outlet except by Scotts. In the event of substantial change in ownership, management or basic operating policies of the retailer, Scotts reserves the right of decision concerning the continuation of the dealership.

\*    \*    \*    \*    \*    \*

It is our fervent hope that this Code of Relationship will serve as an effective guide to all concerned and that it will foster lasting benefits to the Scotts Dealer, the Company and the Public.

Charles B. Mills, Chairman

Paul C. Williams, President"
January 1961

The nature of the Scotts products is such that they require intelligent and informed use by the consumer both for economical use and to obtain the results for which they are designed. Scott en-

deavoured, long prior to and during the period in question, to obtain a type of dealer who would advance his own and Scotts interest by rendering consumer advice and guidance on Scotts products and in Scotts lawn programs. By and large Scott found such dealers to fall into the categories of independent hardware stores, independent garden centers, department stores, drug stores and florists. Scott felt that one of the essentials in obtaining and maintaining service-oriented dealers was that such dealers have a "generous profit margin."

21. During the period 1959–64 Scott implemented its selling policies in the following manner:

A.(1) By continuing to print the retail price on packaged products as an integral part thereof, and, in the case of products not packaged, by attaching the retail price to the article in some secure fashion;

(2) By distributing order forms to dealers which included Scott's designated prices;

(3) By distributing the "Code of Relationship" to its dealers in 1961. (At this time, 4% of Scott's dealers, doing about 5% of Scott's annual volume, were located in non-fair trade states).

(4) By making available to retailers advertising mats for use in media to be selected by the dealer. When such mats contained prices, the prices quoted were those established by Scott. By granting to dealers an advertising allowance of a proportionate share of the cost of advertising Scott's products. This was so whether Scott's mats were used or not.

(5) By advertising its products nationally through various media which advertisements sometimes included the retail price designated by Scott;

(6) From time to time by taking local newspaper ads throughout various cities in the United States which advertised Scott products and con-
tained designated retail prices for such products and the designation of one or more specific retail establishments in or near the given city where the products could be purchased;

(7) By sending its publication "Lawn Care," to customers and potential customers. This publication, would from time to time in referring to specific Scott products, mention the retail price thereof;

(8) By furnishing to its dealers literature of an instructional nature to hand out to customers in their stores or to mail to householders. This literature in mentioning Scott products would state the retail price thereon.

(9) By sponsoring seasonal promotional sales. These sales would be advertised nationally by Scott and advertising mats would be furnished to dealers. In connection with these promotions, discounts over the regular Scott retail price would be offered.

(10) By having Account Executives and District Managers visit dealers with a view to advising and helping in the matter of display, stocks of and information on the use of Scott's products and on its lawn care programs;

(11) By establishing a policy whereby dealers made refunds to any dissatisfied customers of Scott's products and Scott would, in turn, reimburse the dealer for such refunds;

(The foregoing steps to implement its selling policies were taken by Scott with all its dealers regardless of whether they operated in fair-trade states or non-fair trade states. During the period in question, Scott sales in non-fair trade states never exceeded 7% of its gross.)

B.(1) Scott entered into written price maintenance agreements with all dealers in fair trade states as permitted by law.

22. While Scott has, in large measure, selected dealers in both fair trade

and non-fair trade states whom it felt would be service-oriented and whom it felt would re-sell at the retail prices designated on its products by Scott in order to make it worthwhile for them to render the desired sales service to users, Scott made no effort in non-fair trade states to enter into written or oral, price maintenance agreements with such dealers. In the period here involved, Scott has neither terminated nor threatened to terminate any dealership in a non-fair trade state solely for under-selling Scott-designated prices.

23. In total numbers, there have been a great many occasions when Scott dealers, in non-fair trade states, have sold Scott products at prices under those designated by Scott. There have also been occasions, fewer in number, when Scott dealers in non-fair trade states have advertised Scott products at less than the Scott-designated price. Where such sales or advertising has occurred, it has usually been for one or more of the following reasons:

1. To meet competition from another dealer;

2. To dispose of items at the end of the garden season;

3. To bulk purchasers;

4. To special customers.

However, the great bulk of Scott products sold in non-fair trade states has been sold at Scott-designated prices. The great majority of these dealers sold a very substantial portion of all the products handled by them, whether Scott's products or those from other sources, at prices designated either by the manufacturer or the wholesaler. It was the general feeling among those independent dealers, who, on the whole, were as independent in fact as in name, that while they could cut the designated prices on Scott's products or on the many other price-designated items in their stock, that they could not do so and remain in business. They felt, and with good reason, that to remain in business they had to operate on a profit margin greater than the margin that chain,

mass-distributors could operate on. The attitude of these independent dealers during the period 1959–64, had in no way changed from their attitude during the years 1957 et seq., when they contributed largely to the "Vigoro" debacle. When Scott dealers sold at Scott's designated prices, they did so voluntarily to advance their own self-interest. They followed similar practices in the retail sales of many other products than those made by Scott. At no time did any dealer change his pre-existing sales practices as the result of any action by Scott.

24. In the latter part of 1963, Scott felt the need to begin modification of its dealer policy because of significant changes in the marketing habits of the public, particularly those of young, married couples. It became apparent to Scott that a large segment of the public was dealing primarily with mass merchandisers. At this time Scott began, in a small way, to put its products in mass merchandising outlets and to improve its labelling and literature so as to reduce the necessity for personal advice and guidance in the use of its products. The number of clerks interested in service-oriented selling was also declining. The first mass marketing outlets that Scott chose were in Illinois, New York, New Jersey and Massachusetts. In these States the "nonsigner clause" of the State Fair-Trade Act provided price maintenance on Scott's products.

In the mid 1960's Scott began selling to the exchanges of the Armed Forces.

Over the years, since 1963, the mass distribution outlets handling Scott's products has shown a substantial growth. In 1964 there were approximately 40 such outlets; in 1965, approximately 100; in 1966, approximately 1100; in 1967–1500; in 1968–2,000 and it is estimated that in 1969 there will be 3,500 such outlets. Where mass distribution outlets operate solely within the confines of a non-fair trade state, there is no price maintenance agreement between Scott and outlet owners. Where the

mass distribution dealer operates solely in fair-trade states, there is a price maintenance agreement. Where a mass distributor operates outlets in both fair-trade and non-fair trade states, there is a price maintenance agreement between Scott and the dealer but the agreement excludes maintenance in non-fair trade states.

25. By 1968 the business established by a War Between the States Veteran from Union County, Ohio, in 1869, had become the O. M. Scott & Sons Co., an Ohio corporation, with principal offices in Marysville, Ohio. Its products had grown from the original cleaned pasture seed to a variety of products suitable for the care of home lawns, gardens and golf courses and included grass seeds, fertilizers weed controls, insect controls, fungus controls, spreaders or mechanical applicators and lawn mowers. Its business had become nation-wide and its products were sold through some 12,000 retail dealers, operating 17,000 retail outlets. Its lawn-care magazine first published and distributed in 1928, had grown and developed over the years. Some 25 years ago Scott began to distribute "Lawn Care" on a regional basis, taking into consideration soil and climatic conditions in each region and adapting the copy to the region. In 1968 "Lawn Care" was published in 19 regional editions, covering the United States. Total distribution of "Lawn Care" to consumers and potential consumers had reached 2,000,000 in 1968.

### OPINION

The Sherman Act, 15 U.S.C. § 1, proscribes "every contract, combination or conspiracy" in restraint of trade. In non-fair trade states any contract, combination or conspiracy between a manufacturer and its dealers to maintain the manufacturers designated retail price is *per se* an unlawful restraint of trade. Dr. Miles Medical Co. v. John D. Park & Sons, 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911).

By virtue of the Miller-Tydings amendment to 15 U.S.C. § 1 and the Mc-Guire Act, 15 U.S.C. § 45, resale price maintenance is permitted in those states that have enacted fair-trade acts.

In interpreting the Sherman Act throughout the years where anti-competitive business conduct has been under scrutiny, the Courts have condemned the conduct only on a finding that two or more parties "agreed" to contract, combine or conspire to maintain prices. However, the definition of "agreement" has been the subject of continuous legal interpretation, dispute and development.

In United States v. Colgate & Co., 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919), the Court said:

"The purpose of the Sherman Act is to prohibit monopolies, contracts and combinations which probably would unduly interfere with the free exercise of their rights by those engaged, or who wish to engage, in trade and commerce—in a word to preserve the right of freedom to trade. In the absence of any purpose to create or maintain a monopoly, the act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal. And, of course, he may announce in advance the circumstances under which he will refuse to sell. 'The trader or manufacturer, on the other hand, carries on an entirely private business, and can sell to whom he pleases.' United States v. Trans-Missouri Freight Association, 166 U.S. 290, 320 [17 S.Ct. 540, 551, 41 L.Ed. 1007]. 'A retail dealer has the unquestioned right to stop dealing with a wholesaler for reasons sufficient to himself, and may do so because he thinks such dealer is acting unfairly in trying to undermine his trade.' Eastern States Retail Lumber Dealers' Association v. United States, 234 U.S. 600, 614 [34 S.Ct. 951, 955, 58 L.Ed. 1490]. See also Standard Oil Co. v. United States, 221 U.S. 1, 56 [31 S.Ct. 502, 55 L.Ed. 619]; United States v. American Tobacco Co., 221 U.S. 106, 180 [31 S.Ct. 632,

55 L.Ed. 663]; Boston Store of Chicago v. American Graphophone Co. [et al.], 246 U.S. 8 [38 S.Ct. 257, 62 L.Ed. 55]. In Dr. Miles Medical Co. v. Park & Sons Co. [220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502], the unlawful combination was effected through contracts which undertook to prevent dealers from freely exercising the right to sell."

In this case the Supreme Court seemed to hold that a manufacturer could state that it would sell only to dealers who would abide by its designated retail prices, and by conduct, including refusal to sell further to dealers who would not comply with its policies, effect by acquiescence of the dealers the same result, which, if reached by contract, *Dr. Miles* had forbidden.

Soon thereafter the Supreme Court extended the "contract" concept to apply to implied agreements as well as formal contracts. The Court found implied contracts, or "unlawful combinations" where, in addition to suggesting prices and refusing to deal, the manufacturers adopted stringent detection and policing arrangements. United States v. A. Schrader's Son, Inc., 252 U.S. 85, 40 S.Ct. 251, 64 L.Ed. 471 (1920); FTC v. Beech-Nut Packing Co., 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307 (1922).

In Interstate Circuit v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939), it was charged that distributors of motion picture films engaged, interstate, in the business of supplying films to exhibitors, illegally joined in an agreement with certain of the exhibitors in certain cities whereby the distributors in granting licenses to other exhibitors in the same city for the subsequent run of pictures would require that the later exhibitors observe a minimum price of admission and abstain from presenting a picture so licensed with ony other feature picture at the same show.

The Trial Court found, on the facts of the case, that defendant-distributors had entered into an agreement to impose restrictions on their licensees in violation of the Sherman Act.

There was no written agreement between the defendants in this case. Both the Trial Court and the Supreme Court relied on inferences drawn from the facts of the case in concluding that an agreement existed between the defendants. In reaching this conclusion, both Courts relied heavily on the proved fact that compliance by distributors with certain proposals "involved a radical departure from the previous business practices of the industry and a drastic increase in admissions of most of the subsequent run theaters."

The Court went on to say in dictum, pages 226-227, 59 S.Ct. page 474:

"While the District Court's finding of an agreement of the distributors among themselves is, supported by the evidence, we think that in the circumstances of this case such agreement for the imposition of the restrictions upon subsequent-run exhibitors was not a prerequisite to an unlawful conspiracy. It was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it. Each distributor was advised that the others were asked to participate; each knew that cooperation was essential to successful operation of the plan. They knew that the plan, if carried out, would result in a restraint of commerce, which, we will presently point out, was unreasonable within the meaning of the Sherman Act, and knowing it, all participated in the plan. The evidence *is* persuasive that each distributor early became aware that the others had joined. With that knowledge they renewed the arrangement and carried it into effect for the two successive years.

"It is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators.

United States v. Schenck [D.C.], 253 F. 212, 213, aff'd, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470; Levey v. United States [9 Cir.], 92 F.2d 688, 691. Acceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act. Eastern States [Retail] Lumber [Dealers'] Ass'n. v. United States, 234 U.S. 600 [34 S.Ct. 951, 58 L.Ed. 1490]; Lawlor v. Loewe, 235 U.S. 522, 534 [35 S.Ct. 170, 171, 59 L.Ed. 341]; American Column [& Lumber] Co. v. United States, 257 U.S. 377 [42 S.Ct. 114, 66 L.Ed. 284]; United States v. American Linseed Oil Co., 262 U.S. 371 [43 S.Ct. 607, 67 L.Ed. 1035]."

A loose interpretation of the dictum in *Interstate* might lead one to believe that any "conscious parallelism" in price maintenance is unlawful. Subsequent decided cases do not go so far.

In United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960), the Court found that the defendant went beyond the scope of *Colgate* by the following actions:

1. Announcing a policy of refusing to deal with retailers who failed to observe defendant's suggested minimum resale prices or who advertised discount prices on defendant's products.

2. Discontinuing direct sales to retailers who failed to abide by announced policy.

3. Inducing wholesale distributors to stop selling defendant's products to offending retailers by threatening to refuse to deal with them if they sold to price-cutting retailers who had been cut off by defendant.

4. Securing unanimous adherence by informing a number of the retailers that, if each of them would adhere to the announced policy, one of their principal competitors would also do so.

5. Permitting retailers to resume purchasing defendant's products after they indicated a willingness to observe defendant's policy.

In holding that *Parke, Davis* had exceeded the scope of *Colgate*, the Court said, at page 45, 80 S.Ct. at page 512:

"The program upon which Parke Davis embarked to promote general compliance with its suggested resale prices plainly exceeded the limitations of the *Colgate* doctrine and under *Beech-Nut* and *Bausch & Lomb* effected arrangements which violated the Sherman Act. Parke Davis did not content itself with announcing its policy regarding retail prices and following this with a simple refusal to have business relations with any retailers who disregarded that policy. Instead Parke Davis used the refusal to deal with the wholesalers in order to elicit their willingness to deny Parke Davis products to retailers and thereby help gain the retailers' adherence to its suggested minimum retail prices. The retailers who disregarded the price policy were promptly cut off when Parke Davis supplied the wholesalers with their names."

The Court said further at pages 46–47, 80 S.Ct. at page 513:

"It must be admitted that a seller's announcement that he will not deal with customers who do not observe his policy may tend to engender confidence in each customer that if he complies his competitors will also. But if a manufacturer is unwilling to rely on individual self-interest to bring about general voluntary acquiescence which has the collateral effect of eliminating price competition, and takes affirmative action to achieve uniform adherence by inducing each customer to adhere to avoid such price competition, the customers' acquiescence is not then a matter of individual free choice prompted alone by the desirability of the product. The product then comes

packaged in a competition-free wrapping—a valuable feature in itself—by virtue of concerted action induced by the manufacturer. The manufacturer is thus the organizer of a price-maintenance combination or conspiracy in violation of the Sherman Act."

In Albrecht v. Herald Co., 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968). Respondent, a newspaper publisher, cut off a newspaper dealer because he did not adhere to the maximum retail price set by respondent. The Court held that fixing a maximum as well as a minimum resale price by agreement or combination is a *per se* violation of the Sherman Act. The Court also held that, on the facts of the case, respondent had engaged in a combination with a company and an individual to fix a resale price which was *per se* a violation of the Sherman Act.

In reaching its decision the Court said, at 149, 88 S.Ct. at 871:

"On the undisputed facts recited by the Court of Appeals respondent's conduct cannot be deemed wholly unilateral and beyond the reach of § 1 of the Sherman Act. That section covers combinations in addition to contracts and conspiracies, express or implied. The Court made this quite clear in United States v. Parke, Davis & Co., 362 U.S. 29 [80 S.Ct. 503, 4 L.Ed.2d 505] (1960), where it held that an illegal combination to fix prices results if a seller suggests resale prices and secures compliance by means in addition to the 'mere announcement of his policy and the simple refusal to deal * * *.' *Id.* at 44 [80 S.Ct. at 512]. Parke Davis had specified resale prices for both wholesalers and retailers and had required wholesalers to refuse to deal with noncomplying retailers. It was found to have created a combination 'with the retailers and the wholesalers to maintain retail prices * * *.' *Id.*, at 45 [80 S.Ct. at 512]. The combination with retailers arose because their acquiescence in the suggested prices was se-cured by threats of termination; the combination with wholesalers arose because they cooperated in terminating price-cutting retailers.

"If a combination arose when Parke Davis threatened its wholesalers with termination unless they put pressure on their retail customers, then there can be no doubt that a combination arose between respondent, Milne, and Kroner to force petitioner to conform to the advertised retail price. * * *"

To what extent has *Colgate* been modified by *Parke Davis, Interstate, Albrecht* and related cases? Both express and implied contracts to maintain resale prices are violations of the Sherman Act. While a manufacturer may announce its policy to designate retail prices and refuse to have business relations with dealers who disregard this policy, he may not go beyond this and by affirmative action gain the dealers acquiescence to avoid competition in such manner that the acquiescence is not the individual free choice of the dealer. The type of "affirmative action" referred to is not simply any affirmative action. If it was, then the mere advertising by a manufacturer of its designated prices would constitute going beyond that which is permitted under *Colgate* and the subsequent cases, and, this has never been so held. The affirmative action, under the cases, must be such as to induce an acquiescence in the dealer that is not of his free choice. Although the Supreme Court has never used the word "coerce" in these cases, some element of coercion is implicit in its decisions in *Interstate, Parke Davis* and *Albrecht.*

Now how do the above principles apply to the facts in the case at bar? Plaintiff admits that no contract existed in violation of the Sherman Act. There is no evidence of a conspiracy. The question then becomes, were defendants' actions in 1959–64 of such nature as to bring about an acquiescence of its dealers, not of their own individual free choice, thus constituting an illegal combination under the Sherman Act?

The critical facts found by this Court can be summarized as follows:

1. Defendant was the manufacturer of premium products.

2. The nature of these products was such that defendant felt that the success of its business depended on service-oriented dealers who would inform and instruct the consumer on how to economically obtain the maximum results from the use of its products, as well as making available to dealers and consumers carefully prepared instructional material on the use of Scott's products.

3. Defendant felt that to insure that dealers would give the necessary service to make its products successful, it was desirable that the dealers realize a "generous profit" on its products.

4. Defendant designated a retail price on its products that would result in a generous profit to dealers.

5. Defendant attempted to choose independent type dealers whom defendant thought would be able to, and willing to, properly service and instruct in the use of defendant's products and who would recognize that it was in the dealers best interest to receive a generous profit to pay him for the product and service. Defendant chose the same type dealers in both fair trade and non-fair trade states.

6. Defendant kept before both the dealers and consumers the retail price designated by defendant on its products by advertisements, both national and local, by Lawn Care distributed to consumers, by printing prices on order forms, and other literature.

7. While defendant's dealers on many occasions sold, and, on a few occasions advertised, defendant's products at less than the designated price, in most instances they sold and advertised defendant's products at the designated prices. Almost all of these dealers were small independents and they needed a generous profit on sales to survive in business. These dealers sold a substantial part of all the products in which they dealt at prices designated by the manufacturers, or, in some cases, by the wholesalers.

8. At no time during the period 1959–64 did Scott terminate or threaten to terminate a dealership in non-fair trade states or the District of Columbia solely for failure of a dealer to sell at Scott's designated prices.

9. Scott's activities did not cause any dealer in non-fair trade states to change his normal manner of doing business.

10. In fair trade states, defendant entered into price maintenance agreements with its dealers. It did not enter into such agreements in non-fair trade areas.

■ Thus, while Scott announced its policy to suggest retail prices for the retail sale of its products, it did not during the period 1959–64 in non-fair trade states terminate or threaten to terminate any dealership solely for failure to maintain retail prices. During this period, and before, Scott very carefully chose, to the extent that it was able, dealers whom Scott believed would be service-oriented and who would likely find it in their own self interest to sell Scott's products at Scott's designated retail prices. The choosing of dealers in such fashion is not proscribed by the Sherman Act.

On the facts found by this Court, it is the Court's opinion that during the period 1959–64 Scott did not by affirmative action in non-fair trade states gain dealer acquiescence to avoid price competition in such manner that the acquiescence was not the individual free choice of the dealers.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and the subject matter in this cause of action under the provisions of the Act of July 2, 1890, titled "An Act To Protect Trade and Commerce Against Unlawful Restraints and Monopolies," commonly known as the Sherman Act (15 U.S.C. 1 et seq.).

2. The defendant, O. M. Scott & Sons Co., during the period 1959–64 was,

and still is, engaged in trade and commerce among the several states and the District of Columbia.

3. During the period 1959–64, defendant did not enter into or become a part of any agreement, combination or conspiracy to maintain resale prices of its products in the District of Columbia or in the states of Kansas, Missouri, Montana, Nebraska, Texas, Utah, Vermont or Wyoming, in violation of Section 1 of the Sherman Act.

4. Plaintiff's request for injunctive and other relief will be denied and the complaint will be dismissed.

Counsel will present a proper Order.