**Richard GRAY et al., Appellants,**

v.

**SHELL OIL COMPANY, Appellee.**

**SHELL OIL COMPANY, Cross-Appellant,**

v.

**Richard GRAY et al., Cross-Appellees.**

**Nos. 25653, 25657.**

United States Court of Appeals,
Ninth Circuit.

Nov. 15, 1972.

Rehearing Denied Dec. 27, 1972.

lations under § 1 [restraint of trade] and § 2 [monopolization] of the Sherman Act (15 U.S.C. §§ 1, 2) and § 2 [price discrimination] of the Clayton Act, as amended by the Robinson-Patman Act (15 U.S.C. § 13). The complaint prayed for both damages and injunctive relief. Shell responded by filing an answer in which it asserted a counterclaim for damages and injunctive relief based on § 1 of the Sherman Act (15 U.S.C. § 1). Following the filing of the complaint, all of the plaintiffs, except the four appellants, voluntarily requested and were permitted to withdraw from the case. Of the four appellants, three leased service stations from Shell and sold its gasoline and related products. The fourth, Richard Gray, was engaged by Shell under a management agreement to operate a Shell owned station.

Peter J. Donnici (argued), Joseph M. Alioto, Lawrence J. Appel, Joseph L. Alioto, San Francisco, Cal., James D. Glenn, Jr., Fremont, Cal., Hirshon, Gerhardt & Bowers, San Jose, Cal., for appellants.

William Simon (argued), John Bodner, Jr., John F. Bruce, of Howrey, Simon, Baker & Murchison, Washington, D. C., McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., for appellee.

Before LUMBARD,* MERRILL and KILKENNY, Circuit Judges.

KILKENNY, Circuit Judge:

Appellants, and a number of other present and former Shell Service Station dealers in the East San Francisco Bay Area, instituted this private treble damage action under the Federal Anti-Trust Laws [1] against appellee and cross-appellant Shell Oil Company [Shell]. The complaint alleged multiple anti-trust vio-

## BACKGROUND

In the area where appellants' stations were located, Shell marketed its gasoline in competition with numerous other oil companies, both large and small. During the period under scrutiny, the marketing of gasoline in the area was highly competitive, the Shell stations being surrounded by many competing stations. Competition among service stations is based on price, advertising, promotion, appearance, location, facilities, hours of operation, service, cleanliness and related subjects. In order to be successful a service station must be competitive in all or most of these areas or trade will be diverted to competing stations. Of the listed essentials, *price* is the most important competitive factor. Price competition is carried on by the use of price signs posted on the curb so that a motorist can decide at which station to buy. With competing service stations located close to each other, as here, motorists, in general, purchase their gasoline at the

* The Honorable J. Edward Lumbard, Senior Circuit Judge for the Second Circuit Court of Appeals, sitting by designation.

1. Jurisdiction based on 15 U.S.C. §§ 15, 27.

service station which indicates a price lower than that of a competing station.

Although some Shell stations are privately owned, most are operated under lease agreements, with Shell selling its gasoline and related products to the operator for resale. A few stations, for example the one operated by appellant Gray, were Shell owned and operated by managers under a commercial agreement. Shell is responsible for various training programs and offers dealers a means of stocking their stations with the requisite inventory of motor oil, tires, batteries and other related automotive products. Each station carried tires, batteries and accessories, either Shell brand products or name brand products distributed by Shell or brands purchased from other suppliers.

The conflict between the parties seems to have originated, at least in part, in the late Spring of 1966 when a group of Shell dealers in the East Bay area organized the CALIFORNIA SHELL DEALERS ASSOCIATION. Shortly after its formation, the association fixed as its goal an increase in retail gasoline prices and the elimination of competition among service stations. Later that year, other service station dealer associations were formed in the San Francisco Bay Area. Following a three month period of coercive activity between the three dealer associations, a Federal Grand Jury commenced an investigation into their activities and in April of 1967 returned an indictment against the associations charging an illegal fixing of retail prices of gasoline in two California counties. Following the indictment, the appellants, and several other dealers involved in the conspiracy, commenced recruiting others to institute this litigation against Shell. At a mass meeting of the dealers on June 3, 1967, the filing of this action was approved.

The anti-trust allegations before us grow primarily out of a marketing situation, commonly called a "gas war".

Shell uses a program it terms as "competitive price assistance" to help their lessee dealers in an area where one or more of the competing stations has dropped the price of gasoline so low that the market share and financial welfare of the service station is at stake. Through a system which we need not outline in detail, Shell absorbs all price cuts beyond a maximum of 1¢ for the lessee dealer. Shell will do this only under three conditions: (1) it will grant price support only if a dealer requests it; (2) the dealer requesting assistance must show real loss and the existence of competition selling at a lower price; and (3) it must be able to ascertain that it is meeting oil company competition, not merely retail competition.[2] In order to determine whether it is meeting lower wholesale prices, Shell contends that it normally gathers the information from competing retail dealers. Although there is no evidence of a systematic exchange of information between the oil companies, Shell admits to obtaining wholesale price information from other major oil companies and using it to determine whether or not it would engage in its dealers' support plan. It argues, of course, that the purpose of obtaining the information was to encourage its dealers to meet the competition in the relevant area and thus comply with its interpretation of the decision in *Sun Oil*. Many oil companies, including Shell, make their wholesale prices publicly known. Some do not.

In the complaint, and as developed in pre-trial procedures, the three basic issues for trial were: (1) whether Shell had engaged in a *horizontal* price-fixing conspiracy with gasoline suppliers to establish the wholesale price of its gasoline purchased by appellants and other Shell dealers, (2) whether Shell had engaged in a *vertical* price-fixing conspiracy with appellants and other Shell dealers by imposing upon them the retail prices at which they had to sell Shell

---

2. Shell contends that F.T.C. v. Sun Oil Co., 371 U.S. 505, 83 S.Ct. 358, 9 L.Ed.2d 466 (1963), suggests condition (3).

gasoline to the motoring public, and (3) whether Shell had forced appellants and other Shell dealers to buy sponsored tires, batteries and accessory products commonly referred to as TBA products. On these issues, appellants claim damages for the period in question.

At the close of appellants' evidence, the lower court (1) granted a directed verdict against Gray, (2) granted a directed verdict against Chandler and White on their vertical price-fixing claims, and (3) granted a directed verdict against appellants in connection with the TBA products claim. The case went to the jury on the remaining issues, including Shell's counterclaim. The jury found against appellants on their claims and in favor of Shell on its counterclaim, but awarded no damages.

## FIRST CONTENTION

At the outset, appellants contend that the record establishes, as a matter of law, an illegal combination in restraint of trade and that they were entitled to a directed verdict on the issue of liability. Appellants present a sweeping argument to the effect that the exchange of price information between the major oil companies, as shown by the record, amounts to a *per se* violation of § 1 of the Sherman Act. They say that Shell exchanged price information with other major suppliers, resulting in identical wholesale prices, which moved up and down in tandem, and they brand these procedures as horizontal price-fixing *per se,* and, argue that whatever the motivation, the procedures employed were illegal under the doctrine enunciated in United States v. Container Corp. of America, 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969).

In support of their argument, appellants emphasize that about seven oil companies controlled some 80% of the western market and that Shell gathered price information from other wholesalers through "non-pricing personnel" for the alleged purpose of "verifying" a reduction in the competition's wholesale price. They then attempt to demonstrate that there was literally no variation in wholesale price levels in the given competitive area during the period here in question. Additionally, appellants contend that the purpose of the price exchange between the major suppliers was to force independent dealers out of business and thereby increase the market share of each major oil company. Here, the appellants utilize evidence that the major oil companies would order retail stations to drastically reduce prices and then the alleged "competitive price support" system would come into play with a resulting broad scale reduction in prices to a level that the independent suppliers could not meet. By thus keeping the major competitors in line on the reduced prices, there could be no erosion of the market share of any of them.

Appellants say that the essential characteristics of this case are undistinguishable from those before the court in United States v. Container Corp. of America, *supra.*

Appellants' reliance on *Container* is misplaced. First of all, we are here faced with the fundamental rule that on appeal the evidence must be viewed in the light most favorable to Shell. Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962). While the recitation of facts in the majority opinion in *Container* is admittedly thin, there is no question but that the Supreme Court found an "agreement" existed between the defendants to exchange price information. Here, despite what is said by appellants, there is an issue on whether there was an agreement to *exchange* price information as that term is used by the Supreme Court in *Container.* There is evidence in the record from which the jury might well decide that there was no agreement, express or implied, between the companies to exchange such information.

■ Beyond that *Container* does not, even if done pursuant to an agreement or a reciprocal understanding, outlaw each and every exchange of price information. Here, as distinguished from

*Container*, the price inquiries were initiated 100% by the appellants themselves and the information was sought, not for the direct benefit of Shell, but for the benefit of the dealers, including appellants. This is a far cry from *Container* where the price information was sought' solely for the benefit of the manufacturers of the corrugated containers. Here, Shell was attempting to give to appellants the type of "price assistance", which it believed was justified under F. T. C. v. Sun Oil Co., *supra*.

■ The least that can be said of Shell's evidence is that it created an issue of fact on the questions: (1) whether there was an agreement, express or implied, between Shell and the other major oil companies to exchange price information, and (2) on the purpose of obtaining such information. The jury resolved these issues against appellants and we will not disturb the verdict. Recently, the precise issue on an "exchange of price information" was before the Tenth Circuit in Belliston v. Texaco, Inc., 455 F.2d 175, 181–182 (CA10 1972), cert. denied 408 U.S. 928, 92 S.Ct. 2494, 33 L.Ed.2d 341 (1972), and decided adversely to appellants' contention.

Along the same line, appellants complain of the district court's instruction which permitted the jury to consider whether Shell's *purpose* in seeking price information from competitors was a good faith effort to comply with the anti-trust laws. Appellants claim that Shell was not acting in good faith. They say Shell would not be subject to the Robinson-Patman liability mentioned in *Sun Oil* to any Shell dealer for secondary-line injury to competition since, unlike *Sun Oil*, its dealers who competed for the same customers were grouped into trade areas and given the same wholesale price and price assistance. While the decision in *Sun* did not specifically approve the use of a "meeting competition" defense where a competing supplier has reduced its wholesale price to a retailer dealer, it did suggest that

such a situation would present a "different case" than that before it. The undisputed evidence is that Shell communicated with a competitor only when other means of verification were unavailable. On the totality of circumstances in this case, it was up to the jury to decide whether Shell's price inquiries were made in connection with a plausible belief that it was conforming to its legal obligations or, whether the inquiries were made for some unlawful purpose, such as price fixing. Under the instructions, the jury could decide either way. Our examination of the instructions convince us that the issues were fairly presented. We find nothing in them which would permit the jury to excuse conduct which would be otherwise illegal.

## SECOND CONTENTION

Next, appellants contend that the court erroneously instructed the jury on the issues of whether Shell unlawfully fixed the retail prices of its dealers. The issue was submitted to the jury under the claim of appellant Wilkins.

Appellants urge that the court's instructions erroneously told the jury that an illegal vertical price-fixing combination in violation of § 1 of the Sherman Act, required that such a combination must be based on actual use of "coercive" threats by Shell and that the instruction deprived appellant Wilkins of the benefit of evidence underscoring Shell's control over its dealers inherent in the parties' relationship.

■ Aside from the fact that appellants by the use of the "coercion" concept in their complaint and trial brief led the court to use that expression, the instructions, as a whole, show that the contention is groundless. Time after time, the jury was told that the "decisive" issue before them was whether Shell dealers were free to make their own pricing decisions or whether Shell deprived its dealers of their free choice by use of affirmative conduct.[3] A court

---

3. "I instruct you that before you may find that the plaintiffs' retail prices were fixed by Shell, you must find that Shell took affirmative steps of a co-

need not use the precise words proposed by one party. The instruction is sufficient if it correctly states the principle of law. Amsler v. United States, 381 F.2d 37, 52 (CA9 1967).

The distinction drawn in the instructions between "coercion" on the one hand and "exposition, persuasion and argument" on the other, to which appellants object is firmly embedded in the decisional law on vertical price-fixing. Checker Motors Corp. v. Chrysler Corp., 405 F.2d 319 (CA2 1969); Susser v. Carvel Corp., 332 F.2d 505 (CA2 1964), cert. dismissed 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284 (1965); United States v. O. M. Scott & Sons Co., 303 F. Supp. 141 (D.C.D.C.1969), cf. United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); Ford Motor Co. v. United States, 335 U. S. 303, 316–317, n. 3, 69 S.Ct. 93, 93 L. Ed. 24 (1948). Our examination of the court's other instructions on vertical price-fixing reveals no error.

### THIRD CONTENTION

Appellant Gray argues that his case should have been submitted to the jury. Notwithstanding appellant's argument that the lower court directed a verdict on a theory that appellant was an employee, rather than an independent contractor, and on that theory alone, our examination of the record convinces us that the verdict was directed on two theories: (1) that appellant occupied a status with Shell in the nature of an employee, and (2) that appellant failed to prove the fact of injury or the amount of any damage.

Assuming, *arguendo*, that the consignment agreement between appellant and Shell makes appellant an independent contractor,[4] as argued by appellant,

rather than an employee, as indicated by the lower court, nevertheless, appellant faced the additional burden of proving injury and damage. The record as we view it is devoid of evidence of injury or damage to appellant and in the language of the trial judge there was ". . . [a] complete failure to present a reasonable measure of damage or, in fact, prove the fact of damage, [at all]."

On the horizontal price-fixing issue, the evidence of damage was limited to Shell's tank wagon prices which it charged its retail dealers. As to the three appellants who were lessee-dealers, this issue was presented to the jury on the basis of a comparison of the tank wagon prices charged in 1961 with the same prices charged during the damage periods in question. As emphasized by the trial judge, appellant Gray never paid tank wagon prices. His earnings were always based on an agreed commission. Under his agreement, Gray received a 4¢ commission regardless of the increase in the tank wagon price. Consequently, on the horizontal price-fixing issue, the proof in the record which would be applicable to the other appellants, was not relevant to Gray.

Assuming, on the "vertical" price-fixing issue, that Shell might have in some manner illegally fixed the retail price, there is absolutely no evidence that appellant was injured. Appellant's opinion, based on his hindsight, that he would have been able to make a greater margin of profit than his 4¢ commission if he had operated as a lessee-dealer, is pure guess work and without foundation in this record. Needless to say, one of the essential elements for recovery under the anti-trust laws is that the claimant be injured or damaged.[5]

---

ercive nature to bring about the fixing of the retail prices." (TR 4475).

&ast; &ast; &ast; &ast; &ast;

"The key issue is whether plaintiffs exercised their own pricing and purchasing discretion or understood that they were free to do so or, on on the other hand, whether Shell's representatives com-

pelled them to agree to price as Shell suggested." (TR 4476–4477).

4. See Simpson v. Union Oil Co. of Calif., 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964).

5. § 4 of the Clayton Act [15 U.S.C. § 15] provides, among other things: "Any per-

Our circuit, in construing the language of § 4 has said, "The 'mere existence of a violation is not sufficient *ipso facto* to support the action' and a 'private person has no right to complain of a violation of § 1 or § 2 [Sherman Act] as such, nor does such a violation *per se* give a private cause of action'". Winckler & Smith Citrus Prod. Co. v. Sunkist Growers, Inc., 346 F.2d 1012, 1014 n. 1 (CA9 1965). Recently, we said: "By its own terms, Clayton Act recovery is available only where actual injury has been suffered." Siegel v. Chicken Delight, Inc., 448 F.2d 43, 52 (CA9 1971). Since appellant failed to produce evidence of injury on either the vertical or horizontal price-fixing issues, he was not entitled to have his claim submitted to the jury.

### FOURTH CONTENTION

■ Appellants next assignment of error challenges the ruling of the court directing a verdict against Chandler and Wright on the vertical price claim. The appellants are faced with the same stumbling block which confronted Gray on his vertical price-fixing claim. The only evidence offered in support of the claim was that of the witness Caldwell, an accountant who prepared charts which were offered in evidence and rejected. Among other things, his testimony demonstrated: (1) that the figures he used were supplied by appellants' counsel and not supported by the record, (2) his profit calculations were not based upon trial testimony, but upon his belief that plaintiffs "felt that they were entitled to additional margins", and (3) the unproven assumption that appellants could have raised their retail gasoline prices six cents a gallon "without losing any volume". This is the type of speculation condemned in Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71, 85–88 (CA9 1969),

cert. denied 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970). We hold that the offer of this exhibit was properly rejected.

The only other evidence on the subject was that of appellant Wilkins, whose case was submitted to the jury. Wilkins offered and had admitted a separate chart which showed: (1) his total volume of gasoline sales for 1961 to 1968 with averages drawn from the pre-complaint and post-complaint period, (2) his "gross" profit for each of these years with comparable averages, and (3) his "net" profit as shown from his personal income tax returns with comparable averages. In a discussion with the court, after Wilkins had testified, the attorney for the other appellants conceded that the Wilkins evidence was of no help to the others.

■ Appellants' present claim of evidence of injury on this issue proceeds on the theory that, but for Shell's control over retail prices, they would have made greater profits at higher retail prices. The evidence in the record refutes that theory. True enough, Chandler expressed an opinion that but for Shell's alleged control of resale prices, he would have averaged an 11¢ per gallon gross profit margin during the years in question. However, his actual margin during that period and the prevailing margin among Shell dealers was 6¢. Beyond that, his actual experience, as shown by the record, demonstrated there was no basis whatsoever for his opinion. When he raised his retail prices 2¢ above Shell's suggested price and later raised prices while he was a Union Oil and Gulf Oil dealer, he suffered a substantial decline, rather than an increase in net profits. Consequently, the only evidence in the record is that Chandler suffered losses, rather than an increase in profits, during the period he was ex-

son who shall be *injured* in his business or property by reason of anything forbidden in the antitrust laws may sue

therefor . . . and shall recover threefold the *damages* by him sustained, . . . . ." (Emphasis supplied.)

perimenting with raising his gross profit margin.

■ As shown by the record, appellant Wright was no more successful than Chandler. He, too, suffered a heavy loss, rather than an increase in profits when he increased his retail prices. In one period, his sales dropped 30% after a price increase. We have searched in vain for anything in the record which would form a basis for the opinions expressed by either White or Chandler. Already, we have commented on appellant Gray's failure to prove injury and we need not here repeat our conclusions. Opinion testimony, such as here offered, without a factual basis in the record, is inadmissible. Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., *supra*, 416 F.2d p. 87. Surely, the opinions of Chandler, White and Gray are as loaded with "rampant speculation" as the evidence before the court in *Seagram, supra*, p. 87.

The facts in Hanover Shoe v. United Shoe Co., 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), upon which appellants rely, bear no similarity to ours. There, the court held, that *Hanover* proved injury and the amount of its damages for the purposes of its treble-damage suit when it produced evidence that *United had overcharged it* during the damage period and demonstrated the amount of the overcharge. Here, there was no proof of an overcharge. Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 696, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962), is of no assistance to appellant. There, *Continental* offered evidence to show that *Union Carbide* and its co-conspirators "had interferred with, acquired, or destroyed the several small independent sources of vanadium oxide relied upon by Continental." The court held that this type of evidence was sufficient to show *injury*. That such conduct on the part of Union Carbide was crucial to the decision, is demonstrated by the court's language " . . . We cannot deem the injury alleged to flow from a monopolist's elimination of one's independent suppliers to be so 'remote' as to justify refusing to let the damages issue go to the jury."

In this record, there is no evidence which even remotely resembles that produced in *Union Carbide*. In Perkins v. Standard Oil Co., 395 U.S. 642, 89 S.Ct. 1871, 23 L.Ed.2d 599 (1969), there was substantial evidence of discriminatory practices on the part of Standard and that Perkins' business was in danger of being destroyed by reason of such practices. Here, again, we have no such evidence. Other cases cited by appellants have received our attention, but we find them unworthy of comment. We conclude that appellants were not entitled to go to the jury on this issue.

## FIFTH CONTENTION

Next, appellants contend that the lower court erred in directing a verdict against them on the alleged unlawful tying or forcing of the sale of TBA products to its retail dealers. Appellants rely principally on F. T. C. v. Texaco, Inc., 393 U.S. 223, 89 S.Ct. 429, 21 L.Ed.2d 394 (1968), where the Supreme Court held that it was illegal for an oil company to induce its dealers to purchase tires, batteries and accessories from certain companies in return for a commission paid by those companies to the oil companies. It was there emphasized that the inducement was illegal where the oil company had a dominant economic power over its dealers and exercised that power to produce anticompetitive effects. Before the court in *Texaco* was a construction of § 5 of the Federal Trade Commission Act [15 U.S. C. § 45], dealing with the prevention of unfair methods of competition and the powers of the Commission to prohibit such conduct. Section 4 of the Clayton Act [15 U.S.C. § 15], with reference to injury and damage in a private antitrust case for treble damages, was not before the court in *Texaco*.

Since we decide this contention on the issue of injury and damage, we need not pass on the legality of Shell's TBA commission plan.[6]

■ On the issue of injury and damage, the appellants offered in evidence a one page exhibit made by the witness Caldwell from "Shell's Profitability Report", which purported to show commissions received by Shell under a pre-1966 sales commission arrangement. The witness who prepared the exhibit was unable to testify whether the figures represented gross selling prices, profits or commissions received by Shell under the pre-1966 arrangement. In any event, the arrangement was not in existence in 1966 and 1967. On this record, the trial court properly rejected the offer. Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., *supra.*

■ On appeal, appellants argue that Shell's Profitability Reports in themselves constituted evidence on the issue of injury and that the jury should have been permitted to explore the reports for relevant evidence of damage and injury. It is appellants' theory that Shell's commissions on TBA, as shown by the report, was the measure of damage to be applied. We find nothing in the record to indicate that appellants would have been entitled to any portion of all of Shell's commissions, if the TBA arrangement had not been in effect. Under ordinary circumstances, the appellant's injury and damage, if any, would be the difference between the price they paid for the TBA merchandise and what they might have been compelled to pay for comparable goods. Here, no such evidence was offered. We conclude that appellants failed to produce evidence of injury or damage sufficient to go to the jury on this issue.

## SIXTH CONTENTION

■ Many times during the course of the trial, counsel for appellee, in the presence of the jury, mentioned the fact that appellants had been indicted by a Federal Grand Jury for violations of the Sherman Act, the Act under which appellants are seeking damages. Appellee recognizes the rule that only prior judgments may be used as evidence in anti-trust actions and then only for specific purposes. 15 U.S.C. § 16(a). Emich Motors Corp. v. General Motors Corp., 340 U.S. 558, 71 S.Ct. 408, 95 L.Ed. 534 (1951). It insists, however, that its use of newspaper articles mentioning the indictment was solely for the purpose of proving its counterclaim in connection with loss of business resulting from adverse publicity generated by the price-fixing indictment of its dealers, the appellants.

In spite of appellants' able argument that the fact of the indictment and the indictment publicity did not affect appellee's injury and damage, we are constrained to hold that Shell's damage period was not limited to the last three months of 1966, prior to the indictment, but might extend to and beyond the date of the return of the indictment. Here, we note that a trial court has a wide latitude in passing on the relevance of evidence in anti-trust cases. Appellants point to 35 or more places in the record where appellee's counsel made reference to the indictment. We have examined each of the pages of the record to which reference has been made, and, although the repetitious references to the indictment are not to be applauded, we hold that in most instances they had relevance to either the appellants' claims against appellee or appellee's counterclaim against appellants, or both. In any event, the references cannot be said

6. Belliston v. Texaco, Inc., *supra,* holds that a similar type of arrangement is not illegal *per se.* 455 F.2d 175, 183 (CA 10 1972).

to be grounds for reversal under Rule 61, F.R.Civ.P.[7] This rule is applicable at the appellate level. Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

■■■ Aside from the above, the court, in its instructions told the jury that the indictments against the appellants, which were mentioned in the testimony, were "not to be considered as evidence of wrongful conduct in this case." Of course, we must assume that the jury followed the court's instructions. United States v. Friedman, 445 F.2d 1076, 1083 (CA9 1971); Vitello v. United States, 425 F.2d 416, 422–423 (CA9 1970).

■■■ Additionally, appellants did not request an instruction which might further limit the effect of the evidence. In these circumstances, the failure of the court *sua sponte* to give a more precise or limiting instruction is not error. United States v. Campbell, 466 F.2d 529 (CA9, 1972); Craft v. United States, 403 F.2d 360, 363 (CA9 1968); Busby v. United States, 296 F.2d 328, 332 (CA 9 1961), cert. denied 369 U.S. 876, 82 S. Ct. 1147, 8 L.Ed.2d 278 (1962).

### SEVENTH CONTENTION

Finally, appellants urge that the lower court should not have awarded Shell its costs in its defense of the complaint and costs and attorney fees on its counterclaim. We have examined each of the contentions in this respect and find nothing which would prompt us to disturb the conclusions of the lower court.

Finding no merit in appellants' appeal, we accept appellee's proposal and do not reach its cross-appeal.

The judgment of the lower court is affirmed.

7. Rule 61, F.R.Civ.P. *Harmless Error.*
   "No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."