Everet L. AMOS, Dale Baker, Peter Baldwin, Timothy Baldwin, Ronald Bennett, Charles Boozier, Lee A. Borchers, Billy J. Breedlover, Timothy Brown, Daniel W. Carpenter, Gary Clark, Gerald R. Cochran, William L. Covey, Richard Cruanas, Mathew L. Dearman, Clifford H. Eichorst, David Frison, Donald P. Giles, Jesse Hale, Lawrence E. Hamm, James Heaton, Dennis L. Hickman, Robert L. Johns, James Kirkhart, Michael K. Laflin, William S. Larson, Michael Lazareff, William C. Manning, David D. McGee, Ramezan Ali Nafeie, Loy C. Nix, Stanley S. Ottinger, Sr., David R. Owens, John Parks, Richard R. Ross, Darryl D. Sisto, C.E. Sneed, David Strand, Bradley Templeton, James P. Villanueva, Alvin Duane Warrick, James B. White, James L. White, James R. Wirkkula, Dwight Woodhead, Jim's Union Service, Inc., P & T Baldwin Enterprises Inc., Wilsonville Union Service Ltd., Lee Borchers Inc., COGSCO Inc., Hickman's Union 76 Inc., Smitty's Union 76 Inc., Jim Villanueva's Gresham Inc., Jim's Union Service Inc., J.L. & M.A. Enterprises Inc., ABC Investments Inc., Matt's 76 Service Inc., C–Anna–Lee Inc., Jim Ray Inc., Marie Covey, Bernie M. Villanueva, Anne Eichorst, Marlyce McGee, Cynthia Owens, Plaintiffs,

v.

UNION OIL COMPANY OF CALIFORNIA, dba Unocal, a California corporation, Defendant.

Civ. No. 86–1007–PA.

United States District Court, D. Oregon.

July 6, 1987.

David S. Shannon, Shannon and Johnson, P.C., Portland, Or., for plaintiffs.

Michael D. Williams, Williams, Frederickson, Stark & Weisensee, P.C., Portland, Or., for defendant.

PANNER, Chief Judge.

Forty-five Union Oil Company of California (Unocal) dealers brought this diversity action against Unocal alleging various breach of contract and tort claims. I bifurcated trial on liability and damages. Beginning April 21, 1987, the jury tried liability. I denied defendant's motions for a directed verdict and submitted five claims to the jury. The jury found for plaintiffs on the breach of an implied covenant of good faith and fair dealing, fraud, and tortious bad faith and unfair dealing.

Beginning on May 18, 1987, the jury tried damages as to those three claims. I again denied defendant's motions for a directed verdict. The jury found economic damages, emotional suffering damages, and punitive damages for each plaintiff. This opinion articulates some of my reasons for denying defendant's motions for directed verdicts.

## BACKGROUND FACTS

The evidence was uncontradicted that over a period of many years Unocal positioned itself and its dealers at the upper end of the gasoline service business by emphasizing unique product, clean stations, and good service. Each new dealer took a Unocal training course emphasizing the qualities needed to compete in that market. While most oil companies offered leaded regular, unleaded regular, and a premium gasoline, Unocal in the late 1970s discontinued selling leaded regular gasoline and decided instead to market only two grades of gasoline. Rather than compete directly with other brands, it chose to market two specialized grades: an 89 octane unleaded regular and a 91 octane leaded premium.

Most brands of unleaded gasoline were 87 octane or less. Unocal's product, without a lead additive and at the higher 89 octane, was unique in the marketplace. Over the years Unocal strongly promoted its unique 89 octane fuel. Some vehicles perform well with 89 octane but not 87 octane fuel.

Unocal's second grade offering, the 91 octane leaded premium, was also a unique offering because federal regulations required gradual elimination of lead. By the end of 1987 no lead may be added. By 1985 no other major oil company was selling leaded premium. This product was particularly desirable for high-performance engines. Some engines, such as race engines and motorcycles, can be damaged by using unleaded fuel.

Unocal's two grades of 89 octane unleaded regular and 91 leaded premium competed effectively with the three grades offered by the competition.

Unocal had established its niche in the marketplace by advertising and promoting quality and the uniqueness of its products. Traditionally, Unocal priced its products somewhat higher than its competitors, but convinced its dealers that they could compete at slightly higher prices by emphasizing service, quality, and uniqueness.

The parties agreed that there was a type of partnership relationship between Unocal and its dealers. There was evidence from the defendant that it owed a duty to its dealers to be competitive in the market even though no one expected Unocal to match the prices penny for penny.

## STANDARDS

### 1. Directed Verdict.

■ Since granting a motion for directed verdict deprives a party of a determination of the facts by the jury, it should be cautiously and sparingly granted. Wright & Miller, Federal Practice and Procedure: Civil § 2524 (1971). The question is whether there is evidence from which the jury could properly find a verdict for that party. *State of Washington v. United States*, 214 F.2d 33, 40–41 (9th Cir.), *cert. denied*, 348 U.S. 862, 75 S.Ct. 86, 99 L.Ed. 679 (1954). The court is not free to weigh the evidence, *Cockrum v. Whitney*, 479 F.2d 84 (9th Cir.1973), but must view the evidence most favorably to the party against whom the motion is made and give that party the benefit of all reasonable inferences. *McCollum v. Smith*, 339 F.2d 348 (9th Cir.1964).

### 2. Implied Covenant Of Good Faith And Fair Dealing.

Oregon law implies a covenant of good faith and fair dealing as a condition in contracts. As the Oregon Supreme Court said, citing Justice Cardozo in *Wood v. Lucy, Lady Duff-Gordon*, 222 N.Y. 88, 118 N.E. 214 (1917), "We are not to suppose that one party was to be placed at the mercy of the other." *Perkins v. Standard Oil Co.*, 235 Or. 7, 16, 383 P.2d 107 (1963). This is true even if the good faith limitation must overcome an express provision, *Comini v. Union Oil Co.*, 277 Or. 753, 756, 562 P.2d 175 (1977), at least where there is an element of reliance such as in partnership, insurance or franchise agreements or where one party has traditionally held vastly superior bargaining power. *Triangle Mining Co., Inc. v. Stauffer Chemical Co.*, 753 F.2d 734, 740 (9th Cir.1985). There is no express limiting provision in this case.

### 3. Tortious Bad Faith And Unfair Dealing.

■ Defendant was under a duty to behave toward these plaintiffs with good faith and fair dealing because of the special relationship that existed between them. *Harper v. Interstate Brewery Co.*, 168 Or. 26, 120 P.2d 757 (1942). To prove the tort of bad faith and unfair dealing, plaintiffs must show that the special relationship existed between the parties, that the relationship made the injury from breach of this duty foreseeable, and that the defendant breached this duty to plaintiffs' injury. *Id.* As the *Harper* court recognized, a cause of action may exist in tort even though it is not completely disconnected from the contract when the relationship established by contract creates an independent additional duty at common law. *Id.* at 37–38. *Cf. Seamen's Direct Buying Service, Inc. v. Standard Oil Co. of California*, 36 Cal.3d 752, 206 Cal.Rptr. 354, 362, 686 P.2d 1158 (1984) (some special relationship must exist for a common law tort duty to exist aside from the context of the ordinary commercial contract).

### 4. Fraud.

To constitute fraud in Oregon, it must be proved by clear and convincing evidence that there was a false and material representation, that the speaker knew of its falsity or was ignorant of its truth, that the speaker intended the hearer to act on it in the manner reasonably contemplated, that the hearer was ignorant of its falsity, relied on its truth, and had a right to rely

thereon, to the hearer's injury. *Webb v. Clark*, 274 Or. 387, 391, 546 P.2d 1078 (1976).

## DISCUSSION

■ Plaintiffs' claims in this case arose out of events occurring in 1985 and 1986.

First, on September 28, 1985, Unocal suddenly changed its 89 octane unleaded gasoline to 87 octane unleaded in the Northwest only. Plaintiffs presented evidence that the discontinuance of the special grade and substitution of a commonplace product without a competitive price made it impossible for plaintiffs to compete. The dealers suffered complaints from customers whose cars did not perform well with the lower octane product and confusion as to why they should pay a higher price for a product available everywhere for substantially less. Unocal conducted no prior studies of the effect of the change on the dealers. There was evidence that Unocal recognized and ignored the risk of a dramatic shift in customer base and volume loss with the change to 87 octane without becoming competitive on the price.

There was evidence that Unocal knew that the 87 octane product needed to be priced much more aggressively than the 89 product to be competitive, but that Unocal kept its prices significantly higher than the competition. Nevertheless, Unocal expected the dealers to be competitive in the marketplace. Unocal representatives urged the dealers to boost volume of sales by selling gasoline at or below dealer cost, relying for profitability on Unocal's rebate program which awards volume growth. There was evidence, however, that the rebate program did not effectively support dealers, especially in times of falling sales volume. Although Unocal's 89 octane product had been the focus of its strong promotional campaign, Unocal did nothing to advertise the changeover to 87 octane or to become competitive on price. There was evidence that Unocal reduced the quality of gasoline in the Northwest in order to maintain full supplies of higher octane fuel in California, where 89 octane sales continued. California is a more profitable sales region for the company. There was also evidence that the Northwest was used as a test market for the company. The trial balloon turned out to be lead.

Second, on April 1, 1986, Unocal officially discontinued selling leaded premium and substituted unleaded premium. There was evidence that this change further eroded plaintiffs' niche in the marketplace. Before the gasoline could be sold as unleaded, the residues of lead needed to be flushed from Unocal's tanks and each dealer's tanks. Unocal representatives testified that they wanted to prevent competitors from knowing about the change until it was complete. Therefore Unocal deliberately deceived the dealers and the public, delivering unleaded premium to dealers in early February, 1986, but labeling and invoicing it at the higher leaded premium price. There was evidence of numerous customer complaints and dealer embarrassment. Many became suspicious and rumors of the change circulated. Unocal falsely denied that the change had occurred. At a meeting on March 6, 1986, dealers were told that the change would be made and that flushing would be required. However, the dealers were not told that the change had already occurred until the end of March, 1986.

Third, there was evidence that the company was too slow to respond to rapidly falling gasoline prices during the first quarter of 1986. There was evidence that it is essential in a market where a few pennies per gallon is significant, that an oil company react to the market as fast as possible. Company officials admitted that at times in February and March, 1986, their prices were "out of the market." There is evidence from which a jury could conclude that other oil companies were keeping up with the market but Unocal was not meeting its responsibility.

There was evidence that prior to the foregoing events, both the company and the dealers considered their relationship to be a trust relationship. At least one Unocal official described it as a partnership.

A jury could conclude that the severe loss of sales suffered by the plaintiffs resulted from the combination of the events

described. A jury could conclude that Unocal knew or should have known the dealer hardship caused by its actions. One internal company memorandum dated March 10, 1986, stated:

> Due to rapid erosion of competitive prices and our attempt to extract as much as possible from the marketplace, we have placed our dealer organization in a very uncompetitive position. It is essential that we provide price relief as soon as possible.

There is evidence that no such relief was provided. There was adequate evidence of fraud in selling and delivering unleaded gasoline to the dealers and representing it was leaded. Plaintiffs presented evidence of embarrassment, humiliation, and a variety of emotional and mental reactions to customer complaints and loss of business.

## CONCLUSION

The jury had evidence that Unocal breached the implied condition in the contract of good faith and fair dealing, breached its duty of good faith and fair dealing, and committed fraud. There was evidence of economic, emotional, and punitive damages.