William T. PRIDE; Pride Enterprises, Inc.; Robert J. Weber, Plaintiffs–Appellants,

v.

EXXON CORPORATION; Texaco Refining and Marketing, Inc., Defendants–Appellees.

No. 89–35276.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 7, 1990.

Decided Aug. 13, 1990.

David S. Shannon, Shannon and Johnson, Portland, Or., for plaintiffs-appellants.

Robert G. Abrams, Howrey & Simon, Washington, D.C., and Robert E. Fuller, White Plains, N.Y., for defendants-appellees.

Before WALLACE, SKOPIL and BRUNETTI, Circuit Judges.

WALLACE, Circuit Judge:

Pride and Pride Enterprises, Inc. (Pride) and Weber appeal from a summary judgment entered by the district court in favor of Exxon Corporation (Exxon) and Texaco Refining and Marketing, Inc. (Texaco). The district court had jurisdiction pursuant to 15 U.S.C. § 2805 and possessed pendent jurisdiction over Pride and Weber's state claims. We have jurisdiction over this timely appeal pursuant to 28 U.S.C. § 1291. We affirm in part and reverse and remand in part.

## I

Texaco negotiated with Exxon to exchange Texaco's Northern California service stations for Exxon service stations in Southern California, Nevada, Oregon, and Washington. In April 1988, Texaco submitted and Exxon accepted an offer to exchange these stations. A few days later, Exxon sent notices of termination and withdrawal to its franchises in the Portland area, including the separate stations operated by Pride and Weber. A few weeks later, Texaco sent offers to the terminated Exxon franchises inviting them to become Texaco franchisees. Both Pride and Weber accepted this offer and since November 1988 have been operating their service stations as Texaco brand dealers.

Pride and Weber filed an action alleging that Exxon violated the withdrawal provisions of the Petroleum Marketing Practices Act, 15 U.S.C. § 2801, *et seq.* (Act). Pride and Weber also claimed that Texaco violated its duty of good faith due to Texaco's continued operation of service stations in Pride and Weber's service areas. Finally, Pride claimed that Exxon misrepresented its intentions to withdraw when Exxon entered into its franchise contract with Pride. Texaco and Exxon successfully moved for summary judgment on all of these claims.

We review a summary judgment de novo. *Kruso v. International Telephone & Telegraph Corp.*, 872 F.2d 1416, 1421 (9th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990). Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Tzung v. State Farm Fire & Casualty Co.*, 873 F.2d 1338, 1339–40 (9th Cir.1989).

## II

■ We first address whether Exxon's withdrawal from the marketing of motor fuel through retail outlets in the Portland area complied with the requirements of the Act. 15 U.S.C. § 2802(a) prohibits the termination or nonrenewal of a franchise relationship except as provided for in 15 U.S.C. § 2802(b). Pride and Weber contend that Exxon failed to make a valid withdrawal pursuant to section 2802(b)(2)(E) because Exxon failed to demonstrate in its motion for summary judgment that it has withdrawn *all* motor fuel from sale, rather than simply *branded* motor fuel. Exxon responded that the withdrawal of branded motor fuel suffices to meet the requirements of section 2802(b)(2)(E). The district court sided with Exxon, holding that the terms of section 2802(b)(2)(E) apply only to branded fuel and that therefore Exxon's withdrawal did not violate the Act.

15 U.S.C. § 2802(b)(2)(E) provides in part that:

> the following are grounds for termination of a franchise or nonrenewal of a franchise relationship ...
>
> .　　.　　.　　.　　.
>
> In the case of any franchise entered into prior to June 19, 1978, and in the case of any franchise entered into or renewed on or after such date ..., a determination made by the franchisor in good faith and in the normal course of business to withdraw from the marketing *of motor fuel* through retail outlets in the relevant geographic market area in which the marketing premises are located, if—
>
> > (i) such determination—
> >
> > > (I) was made after the date such franchise was entered into or renewed, and
> > >
> > > (II) was based upon the occurrence of changes in relevant facts and circumstances after such date.

*Id.* (emphasis added). Resolution of the dispute on this issue depends on the meaning of the phrase "of motor fuel." Exxon contends that this phrase applies only to branded motor fuel; Pride contends that it applies to both branded *and* unbranded motor fuel.

Read in isolation, the phrase "of motor fuel" does not provide much guidance since it does not explicitly restrict its definition to a particular kind of motor fuel. Therefore, since the phrase is not sufficient alone to resolve the issue, we must consider the

context in which that phrase is used. *See BV Engineering v. University of California, Los Angeles*, 858 F.2d 1394, 1398 (9th Cir.1988) ("It is well settled that in interpreting a statute we must consider each provision in the context of the statute as a whole."), *cert. denied*, —— U.S. ——, 109 S.Ct. 1557, 103 L.Ed.2d 859 (1989).

While our circuit has not directly addressed the question, a number of other courts have reasoned that the Act does not apply to unbranded fuel because of the statutory context in which the phrase "of motor fuel" is used in the Act. In this case, the district court relied primarily upon *Rogue Valley Stations v. Birk Oil Co.*, 568 F.Supp. 337 (D.Or.1983). Adopting the reasoning of a commentator on the Act, *Rogue Valley* described the type of relationship governed by the Act as follows:

> The Act applies to specified aspects *of the branded dealer's relationship with his supplier.* For example, the term "franchise" includes any contract for the distributor *of branded motor fuel* and any lease of marketing premises for such distribution. The term "franchise relationship" more broadly covers the fuel marketing obligations and responsibilities of the franchisor and franchisee regardless of whether these responsibilities are specified in a current contract.

*Id.* at 343 (emphasis added), *quoting* Finch, *Judicial Interpretation of the Petroleum Marketing Practices Act: Strict Construction of Remedial Legislation*, 37 Bus.Law. 141, 143 (1981) (footnotes omitted).

The district court's reliance upon the quoted language in *Rogue Valley* is well-founded since the use of the term "franchise" in section 2802(b)(2)(E) strongly supports the conclusion of the district court that the Act does not regulate the sale of unbranded motor fuel. Section 2802(b)(2)(E) falls under the subchapter of the Act entitled "Franchise Protection" and applies explicitly to "franchises" and to the activities of "franchisers." In the definitional section of the Act, 15 U.S.C. § 2801, "franchise" is defined as "any contract ... under which a refiner ... authorizes or permits a retailer or distributor to use, in connection with the sale, consignment or distribution of motor fuel, *a trademark which is owned or controlled by such refiner.*" 15 U.S.C. § 2801(1)(A) (emphasis added). In addition, section 2801 defines "franchisor" and "franchisee" as persons who *"use a trademark* in connection with the sale, consignment, or distribution of motor fuel." 15 U.S.C. § 2801(3) and (4) (emphasis added). Finally, a "franchise relationship" is defined as a relationship arising from "the *marketing* of motor fuel *under a franchise."* 15 U.S.C. § 2801(2) (emphasis added).

■ As these provisions make clear, the term "franchise," as it is used in section 2802(b)(2)(E), applies only to the sale of motor fuel under a trademark. *See Atlantic Richfield Co. v. Guerami*, 820 F.2d 280, 282 (9th Cir.1987) ("franchisee" under the Act is defined as a "person who is authorized to use a trademark"). The terms "brand" or "branded," which the parties use in their briefs, are not used in the Act. However, the term "brand" is synonymous with the term "trademark" for purposes of this case. *See* 15 U.S.C. § 2801(11) ("The term 'trademark' means any trademark, trade name, service mark, or other identifying symbol or name."). Thus, unbranded motor fuel, which obviously is not sold or marketed pursuant to a trademark relationship, is not covered by section 2802(b)(2)(E) because it is not the type of motor fuel that is involved in a franchisor/franchisee relationship.

■ The use of the word "marketing" in the Act also supports the district court's conclusion that the Act applies only to branded motor fuel. Section 2802(b)(2)(E) applies only to the *"marketing* of motor fuel." 15 U.S.C. § 2802(b)(2)(E) (emphasis added). "Marketing," as used in the Act, occurs only in the relationship between a franchisor and a franchisee. *See, e.g.,* 15 U.S.C. § 2801(2), (8), and (9). This relationship, in turn, consists of the distribution and sale of motor fuel through the use of a trademark. The distribution or sale of *un*branded motor fuel, by definition, is not

made pursuant to a trademark relationship. Nor do unbranded distributions or sales occur within the context of a franchisor/franchisee relationship. Consequently, the distribution or sale of unbranded motor fuel cannot be considered "marketing" within the meaning of the Act. Thus, based upon the context in which it appears in section 2802(b)(2)(E), we conclude that the term "motor fuel" does not refer to unbranded motor fuel.

Pride and Weber, however, disagree with our interpretation of the term "motor fuel." They advance an argument based upon 15 U.S.C. § 2801(1)(B)(ii)(II) which provides:

> The term "franchise" includes any contract pertaining to the supply of motor fuel which is to be sold, consigned or distributed under a contract which has existed continuously since May 15, 1973, and pursuant to which, on May 15, 1973, motor fuel was sold, consigned or distributed under a trademark owned or controlled on such date by a refiner....

This section extends the coverage of the Act to those unbranded purchasers, retailers and distributors who (1) operated under a trademark on May 15, 1973, and who (2) have had a continuous contract with the refiner for the supply of motor fuel, but who (3) lost their branded status sometime between May 15, 1973, and June 19, 1978, the date of the Act's enactment. Pride and Weber do not contend that this exception applies to them directly. Rather, they argue that this narrow exception suggests an intention to apply the Act generally to unbranded motor fuel. Such a reading, however, would permit the exception to swallow the rule and would run counter to the contextual analysis described above. We therefore read section 2801(1)(B)(ii)(II) for what it is: a narrowly carved exception to the general rule that the Act does not apply to unbranded motor fuel. That Congress felt compelled to insert language in the Act which states explicitly that the Act *does* apply to these former franchisees simply provides further support for the conclusion that aside from this limited exception, the Act does not apply to sales of unbranded fuel, and thus does not apply to any such sales by Exxon.

Because the statute as a whole is clear, it is unnecessary for us to consult the legislative history of the Act. *Standing Deer v. Carlson,* 831 F.2d 1525, 1530 (9th Cir.1987) ("[W]here, as here, the language of a statute is unambiguous, examination of the statute's legislative history is unnecessary."); *Fernandez v. Brock,* 840 F.2d 622, 632 (9th Cir.1988); *Burlington Northern Railroad v. Oklahoma Tax Commission,* 481 U.S. 454, 461, 107 S.Ct. 1855, 1859–60, 95 L.Ed.2d 404 (1987).

Pride and Weber next contend that a notification provision contained in the withdrawal section of the Act—the statute's requirement that the withdrawing party give notice to the governor pursuant to 15 U.S.C. § 2804(b)(2)(B)—demonstrates that a withdrawing franchisor must discontinue all sales. They reason that the purpose of this provision is to give the governor notice of a significant decline in fuel supplies, and, therefore, this provision—and the Act—must apply to the withdrawal of *all* motor fuel, branded and unbranded.

This argument of Pride and Weber possesses some superficial validity, but adopting it would be inconsistent with the rest of the Act. Section 2804(b)(2)(B) uses exactly the same phrase, "marketing of motor fuel," as is used in section 2802(b)(2)(E). As we discussed above, this phrase, viewed in context, does not apply to unbranded motor fuel. We see no reason to interpret the phrase differently in construing section 2804(b)(2)(B).

Moreover, the premise of Pride and Weber is faulty. Withdrawal does not mean that the overall supply of motor fuel will necessarily be lessened. The case before us illustrates this point—although Exxon withdrew from the market, Texaco took over the former Exxon stations; there was no showing that a reduction in the motor fuel supply occurred. Nor is it illogical that Congress would be concerned in this notification request only with branded motor fuel, since "branded dealers constituted more than ninety percent of all retail fuel outlets in the United States at the time of

the Act's consideration." Finch, *Judicial Interpretation of the PMPA* at 143, *citing* H.R.Rep. No. 1762, 94th Cong., 2d Sess. at 9 (1976).

We conclude that the withdrawal provisions of the Act do not apply to unbranded motor fuel and that Exxon's withdrawal from the Portland market is not in violation of the Act. We therefore affirm the summary judgment on this issue.

## III

■ The second issue is whether the presence of Texaco-operated stations within the vicinity of Pride and Weber's service stations raises a genuine issue of material fact as to whether Texaco breached an implied covenant of good faith.

Oregon's law regarding good faith in the context of a franchise relationship is governed by statute. Oregon Revised Statute § 650.245 states that "the principle of good faith shall govern the relationship and dealings of the parties with each other." Or. Rev.Stat. § 650.245 (1989). The substantive content of this "principle of good faith" has been discussed in a number of Oregon Supreme Court decisions, though the court has explicitly declined to articulate a "comprehensive definition." *See Best v. U.S. National Bank of Oregon*, 303 Or. 557, 739 P.2d 554, 558 (1987). The court has, however, "sought through the good faith doctrine to effectuate the reasonable contractual expectations of the parties." *Id.* When a party possesses discretion under the contract, the duty of good faith requires that party to exercise the discretion for purposes "contemplated by the parties." *Id.* Given this general background of Oregon law, our task is to examine whether the district court was correct in holding that, as a matter of law, Texaco's continued operation of the preexisting stations did not violate the reasonable expectations that the parties held at the time the franchise agreement was executed.

The district court, in responding to Pride and Weber's argument that Texaco's continued operation of other Texaco stations within the service areas surrounding their stations constituted a violation of Texaco's duty of good faith, stated that:

> Plaintiffs' first asserted breach is that Texaco is operating company stations within plaintiffs' trade area. Plaintiffs have failed to show evidence, however, that the parties had a reasonable expectation that this would not be done. The reason for this failure is that plaintiffs have failed to show that circumstances have changed since they entered into the franchise agreement. In other words, plaintiffs cannot establish that they had a reasonable expectation that company-operated stations would not be maintained in their trade-areas if such stations already existed and there has been no increase in such stations.

We are persuaded by this reasoning. Pride and Weber do not contend that they did not know of the presence of other Texaco stations within the vicinity of their stations. Nor do they contend that Texaco undertook any affirmative steps to change the circumstances that existed at the time the contract was signed. Instead, they only argue that Texaco's failure to alter a *preexisting* condition about which Pride and Weber had knowledge constituted a breach of good faith. We cannot read the Oregon duty of good faith as extending that far.

■ As the district court properly observed, a court cannot hold there is a breach of Oregon's duty of good faith without first finding that a change in circumstances has occurred after the signing of the contract. Because the circumstances that were present at the signing of the contract have not been altered, we hold that Texaco did not, under Oregon law, breach its duty of good faith to Pride and Weber by continuing to operate service stations in the surrounding area.

In support of their argument, Pride and Weber, citing *Perkins v. Standard Oil Co.*, 235 Or. 7, 383 P.2d 107, *mod. denied*, 235 Or. 23, 383 P.2d 1002 (1963), contend that the facts in this case are "closely analogous" to the situation where "a franchisor build[s] a new station within the proximity of an existing dealer." This is not a per-

suasive analogy. In *Perkins*, as well as in the other cases cited by Pride and Weber in support of their argument, the reasonable expectations of the parties at the signing of the contract were thwarted due to discretionary actions taken by the franchisors *after* the contract had been signed. In *Perkins*, for example, Standard Oil entered into a distributorship agreement with Perkins and implicitly agreed that it would not solicit as direct customers accounts which had been obtained through Perkins's efforts. *See id.* 383 P.2d at 113. Standard *then* solicited one of Perkins's long-standing customers. The court held that this action undercut Perkins's reasonable expectations and therefore constituted a violation of Standard's duty of good faith. *Id.* at 112–14. *Perkins* thus involved not a preexisting condition but a change in circumstances instigated by the franchisor after the contract had been signed. In the present case, however, Texaco took no action to change the circumstances of which Pride and Weber had knowledge at the time the contract was signed.

If Texaco had constructed its other stations after signing the contract with Pride and Weber, our analysis might be different. The fact remains, however, that the Texaco stations about which Pride and Weber complain preexisted Pride and Weber's contractual franchise relationship with Texaco. This crucial fact serves to distinguish the cases upon which Pride and Weber rely for support. We therefore affirm the summary judgment on this issue.

## IV

 The final issue is whether Pride's misrepresentation claim against Exxon is preempted by the Act. 15 U.S.C. § 2806(a) provides that "no State or any political subdivision thereof may adopt, enforce, or continue in effect any provision of any law or regulation (including any remedy or penalty applicable to any violation thereof) with respect to termination[,] . . . nonrenewal" or the furnishing of notification with respect to these two activities, "unless such provision of such law or regulation is the same as the applicable provision of this

subchapter." This provision of the Act effectively preempts state law governing petroleum franchise terminations and nonrenewals and required notices therefor.

Pride contends that "material representations and material omissions were made by Exxon *prior to Mr. Pride's entry into the franchise agreement.*" Pride further contends that Exxon did not give him an opportunity prior to the execution of the franchise agreement to make an informed decision because Exxon failed to disclose all the matters material to the consideration of the purchase. Pride argues that this claim is not preempted by the Act because the alleged misrepresentations do not relate to a renewal or termination of the franchise relationship, but rather challenge the validity of the underlying contractual agreement. Pride's argument is supported by the fact that his misrepresentation claim is based upon circumstances that occurred *prior* to the commencement of the franchise relationship and therefore prior to the time at which coverage under the Act is triggered.

The district court relied upon *Consumers Petroleum Co. v. Texaco,* 804 F.2d 907 (6th Cir.1986), in holding that Pride's misrepresentation claim was preempted by the Act. In *Consumers Petroleum,* a franchisee alleged that Texaco had made a number of misrepresentations during the course of a five-year agreement. *Id.* at 909. The court held that the franchisee's claims were preempted by the Act because if the claims had been allowed they would have had the "direct effect of seeking to impose a longer notice requirement upon TEXACO than that required under the [Act]." *Id.* at 915. The district court reasoned that permitting Pride's state misrepresentation claim would have a similar effect—that it would require Exxon to disclose its intentions prior to the 180–day requirement of the Act and would thereby impermissibly alter the notice requirements.

 However, the misrepresentation claim, as formulated by Pride, involves the actions of the parties in *forming* the contract. *Consumers Petroleum,* on the other hand, involved a situation where the two

258

parties were *already in* an existing contractual relationship and the franchisor *then* made misrepresentations regarding the withdrawal or failure to renew provisions of the Act. This distinction is crucial, since as the court in *Consumers Petroleum* observed, the Act "does not preempt every state law that relates remotely to the termination or nonrenewal of petroleum franchises; but it does preempt any state law with respect to 'grounds for, procedures for, and notification requirements' with respect to terminations and nonrenewals." *Id., quoting Bellmore v. Mobil Oil Corp.*, 783 F.2d 300, 304 (2d Cir.1986). Oregon state law regarding fraud in the formation of contracts does not implicate the grounds for, procedures for or notification requirements of termination and nonrenewal under the Act because the relationship that the Act governs has not been formed at that stage. *Consumers Petroleum* is thus distinguishable.

In our circuit, we have not addressed the precise issue of whether an action on an underlying franchise contract is preempted by the Act. The Third Circuit, however, has decided a case directly on this point. In *O'Shea v. Amoco Oil Co.*, 886 F.2d 584 (3d Cir.1989), the court reasoned that the Act "only preempts state laws that limit the permissible substantive reasons that a petroleum franchisor can terminate a franchisee. *It thus would not preempt the general common law rule that contracts entered into by fraud are unenforceable.*" *Id.* at 592–93 (emphasis added). The court concluded that "O'Shea's fraudulent inducement claim was not [an Act] claim, but instead a state law claim that was not preempted by the [Act]." *Id.* at 593.

 We agree with the Third Circuit's reasoning and apply it to this case. Pride's fraud claim is not founded upon state law that would have the effect of limiting the permissible statutory reasons that a petroleum franchisor can terminate a franchisee. Rather, his claim calls into question the initial validity of the underlying franchise contract. Like the plaintiff in *O'Shea*, Pride is claiming fraud in the inducement.

 Following *O'Shea*, we hold that Pride's Oregon state law misrepresentation

claim is not preempted by the Act. This holding comports with our general standards of preemption under the Act: that state law is preempted by the Act to the extent it frustrates federal objectives and when it is inconsistent with the Act. *Humboldt Oil Co. v. Exxon Co. U.S.A.*, 823 F.2d 373, 375 (9th Cir.1987), *cert. denied,* 485 U.S. 1021, 108 S.Ct. 1575, 99 L.Ed.2d 890 (1988).

Because the district court properly disposed of the claims under the Act, there are no longer any federal claims remaining in this action. Therefore, we remand Pride's misrepresentation claim against Exxon to the district court with instructions to dismiss this part of the action without prejudice. *See Jones v. Community Redevelopment Agency of the City of Los Angeles*, 733 F.2d 646, 651 (9th Cir. 1984).

V

15 U.S.C. § 2805(d)(1)(C) provides that franchisees who prevail in a section 2802 claim are entitled to attorneys' fees. Since neither Pride nor Weber prevailed in their claim brought pursuant to the Act, they are not entitled to attorneys' fees.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH INSTRUCTIONS.