Carroll NORWOOD; Todd Gunderson; and Joe Amhaz, Plaintiffs,

v.

ATLANTIC RICHFIELD COMPANY, a Delaware corporation, Defendant.

Civ. No. 90–1140–PA.

United States District Court, D. Oregon.

Sept. 23, 1991.

David S. Shannon, Thomas P. Walsh, Shannon, Johnson & Bailey, P.C., Portland, OR, for plaintiffs.

Jeffrey Michael Alden, Randolph C. Foster, Mark J. Fucile, Jacklyn M. Bartruff, Stoel, Rives, Boley, Jones & Grey, Portland, OR, for defendant.

## OPINION

PANNER, District Judge.

Plaintiffs Carroll Norwood, Todd Gunderson, and Joe Amhaz bring this diversity action against Atlantic Richfield Company (ARCO), for violations of Oregon's Motor Fuel Franchise Act and for tortious bad faith

and unfair dealing. Defendant moves for summary judgment on both claims. I grant the motion.

## BACKGROUND

Plaintiffs and defendant are parties to individual franchise agreements. Pursuant to the agreements, defendant grants each plaintiff a franchise for an AM/PM Mini Market and an ARCO facility. Upon entering these franchise relationships, each plaintiff signed an acknowledgement indicating that he had read defendant's booklet entitled "A Statement to Our Dealers and Franchisees on Resale Prices." The acknowledgements also included this sentence: "I understand that I am free to establish whatever resale prices I feel appropriate."

The booklet contains, in pertinent part, five paragraphs describing defendant's retail pricing policy. Defendant makes clear that each franchisee is "free to resell his or her products at any price he or she considers appropriate." Defendant's Exh. 10 at 2. Defendant further acknowledges that it will not tolerate coercion or harassment brought upon dealers by ARCO's personnel. *Id.* Defendant confirms that its franchisees are not obligated to follow its marketing suggestions. *Id.* at 3. Defendant reaffirms that its franchisees "may establish whatever resale prices [they] choose on [their] products." *Id.* at 4.

Notwithstanding such pledges and commitments, plaintiffs allege that defendant compelled them to fix their retail prices in violation of the Oregon Motor Fuel Franchise Act (OMFFA). Plaintiffs further allege that defendant violated both of OMFFA's statutory good faith provisions by attempting to raise prices in the Portland market so high that plaintiffs could not price to consumers below the retail prices of their competitors. Plaintiffs also maintain that defendant's act of raising prices constitutes tortious bad faith due to the alleged special relationship between the parties.[1]

Defendant's gasoline pricing policy consists of the per gallon delivered tankwagon price

of the gasoline (DTW price) and any temporary voluntary allowance (TVA) against the DTW price which defendant may grant. The net dealer buying price equals the DTW price less the TVA, if any. The DTW price depends on the base price used for all gasoline of the same grade sold out of the same terminal, and a delivery adjustment based on the distance of the dealer's station from the terminal.

The TVA program is a voluntary system, which defendant may terminate or modify, by which allowances are given to franchisees to help them remain competitive within a geographic area. Each franchisee is in a designated price zone. In each zone, defendant surveys, at least weekly, the retail prices posted by selected non-ARCO retailers. Defendant uses that information to determine the amount of TVA in that price zone. All franchisees located in the same price zone receive the same TVA credit.

At any given moment, the TVA program is "open," "frozen," or on "holdback." "Open" means that the full TVA indicated by the most recent price survey is granted to dealers. "Holdback" is used when some portion of the TVA which would be granted if the program were "open" is held back. "Frozen" is used when a TVA level previously established is not increased above that level regardless of current price surveys. Dealers receive the maximum allowance when the program is "open," a smaller allowance when the program is on "holdback," and no additional allowance when the program is "frozen."

Plaintiffs' first allegation under their OMFFA claim concerns "pool margins." A "pool margin" is the gross profit margin a retailer achieves on a weighted average basis among the three basic gasoline products sold: regular, unleaded, and supreme. If a retailer sells 100 gallons per month of all three products and achieves gross profit margins of five cents per gallon on regular, ten cents per gallon on unleaded, and fifteen cents per

---

1. During oral argument plaintiffs also attempted to argue that this case involves price fixing between competing companies. Because there is absolutely no evidence of this in the record, I do not discuss it further.

gallon on supreme, the retailer's "pool margin" for that month is ten cents per gallon.

## STANDARDS

█ The court should grant summary judgment if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). If the moving party shows that there are no genuine issues of material fact, the nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A scintilla of evidence, or evidence that is merely colorable or not significantly probative, does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir.), *cert. denied*, 493 U.S. 809, 110 S.Ct. 51, 107 L.Ed.2d 20 (1989).

█ The substantive law governing a claim determines whether a fact is material. *T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987). The court should resolve reasonable doubts about the existence of a material factual issue against the moving party. *Id.* at 631. The court should view inferences drawn from the facts in the light most favorable to the nonmoving party. *Id.* at 630–31.

## DISCUSSION

I will separately address each claim.

## I. OMFFA

### A. Coercive Price Setting

ORS 650.205(4) provides:

Notwithstanding the terms of any franchise, a franchisor shall not:

(4) Set or compel, directly or indirectly, the retail price at which the franchisee sells motor fuel or other products.

Plaintiffs argue that defendant violated ORS 650.205(4) by forcing them to set their prices to achieve a five cent "pool margin." Plaintiffs maintain that they were not free to set their own retail prices based on their judgment and their competitors' prices but were compelled to set prices suggested by defendant because of defendant's coercive tactics in enforcing such suggestions.

Defendant contends that for the time period in question, October 1989 through January 1990, plaintiffs had the freedom to set their retail prices. Defendant argues that because records show that each plaintiff had an average "pool margin" in excess of five cents, plaintiffs have failed to prove coercion or the absence of free choice.

No Oregon court has interpreted this statute. However, cases construing section 1 of the Sherman Act, 15 U.S.C. § 1, are somewhat on point. Unlike the OMFFA, this section of the Sherman Act prohibits combinations or conspiracies in restraint of trade. Nonetheless, many of the cases interpreting the statute discuss elements of coercion divorced from the conspiracy requirement. Given the similarity of issues and the dearth of relevant Oregon case law, the Sherman Act cases are instructive.

█ A Sherman Act violation is established if a retailer shows that (1) the distributor coerced the retailer into adhering to a price schedule and (2) that the retailer acquiesced in this coercion. *Filco v. Amana Refrigeration, Inc.*, 709 F.2d 1257, 1266 (9th Cir.) (citing *Albrecht v. Herald Co.*, 390 U.S. 145, 150 n. 6, 88 S.Ct. 869, 872 n. 6, 19 L.Ed.2d 998 (1968)), *cert. denied*, 464 U.S. 956, 104 S.Ct. 385, 78 L.Ed.2d 331 (1983)). In *Hanson v. Shell Oil Co.*, 541 F.2d 1352 (9th Cir.1976), *cert. denied*, 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977), the plaintiff claimed that the defendant violated section 1 of the Sherman Act by fixing the retail price of gasoline sold by franchised Shell dealers. The court noted that a violation is made out if a buyer's resale price is reached because of a supplier's coercive conduct. *Id.* at 1356 (citing *Simpson v. Union Oil Co. of Calif.*, 377 U.S. 13, 17, 84 S.Ct. 1051, 1054, 12 L.Ed.2d 98 (1964)). The court upheld the district court's grant of a directed verdict to the defendant because the plaintiff failed to show the requisite level of coercion. *Id.* at 1357. More importantly, however, the court noted that:

Even had [the plaintiff] presented sufficient evidence upon which a jury could

have found that Shell attempted to coerce dealers into following the recommended price, his failure to show that any dealers in fact succumbed to this pressure is an additional basis for a directed verdict since without such a showing no connection between Shell's conduct and [the plaintiff's] retail business difficulties could be found.

*Id.* at 1357 n. 3.

The court further stated that:

Gray v. Shell Oil Co., 469 F.2d 742 (9th Cir.1972), [cert. denied, 412 U.S. 943, 93 S.Ct. 2773, 37 L.Ed.2d 403 (1973) ], makes it clear that a supplier may suggest retail prices to its dealers and use "persuasion" to get them to adopt the suggested prices. No violation is made out unless plaintiff can show that the supplier's conduct rose to the level of coercion sufficient to deprive the dealers of their free choice. [The plaintiff] made no such showing.

*Id.* at 1357 n. 4.

In *Gray*, plaintiffs argued that the lower court's instructions erroneously informed the jury that a violation of section 1 must be based on actual use of coercive threats by the defendant. 469 F.2d at 747. The court held that the jury was correctly told that "the decisive issue was whether Shell dealers were free to make their own pricing decisions or whether Shell deprived its dealers of their free choice by use of affirmative conduct." *Id.* The Ninth Circuit defines the affirmative conduct mentioned in *Gray* as conduct which "induce[s] customers to adhere to a uniform price rather than engage in price competition." *General Cinema Corp. v. Buena Vista Distribution Co, Inc.,* 681 F.2d 594, 597 (9th Cir.1982). There, the court noted that "suppliers engage in a variety of actions that might influence resale prices, but those actions are not unlawful unless they sufficiently induce avoidance of price competition." *Id.*

■ Under *Gray* and the other cases, the term "coercion" is not talismanic. If defendant's actions deprived plaintiffs of their free choice to set their retail prices, defendant violates the Sherman Act, and by analogy, the OMFFA. The cases also make clear that mere suggestions and persuasion by defen-

dant is not enough. Furthermore, *Hanson* teaches that a showing by plaintiffs of "attempted coercion" is also not enough. Plaintiffs must demonstrate that they succumbed to defendant's alleged pressure.

Plaintiffs submit excerpts of deposition testimony to prove that defendant compelled them to set their prices in accordance with the five cent "pool margin" goal. Amhaz states:

I know I'm under their thumb. I have to work with them all the time. You know, I'm scared from them.... They could delay my gas loads if they want.... See, the formula the way it works, if you don't go with their suggestion you go out of business tomorrow.

Plaintiffs' Exh. 1 at 3, 4 (Deposition of Joe Amhaz). Norwood states:

[T]hey made sure you stayed at five cents, because if you tried to go over, they'd raise the price of gas to you, ARCO raised the price of gas to you.... [Failure to keep a five cent "pool margin" meant] they'd ruin the business there and they'd bulldoze the station to the ground.... [T]hey would come in time after time after time, day after day, and hammer on you and browbeat you and tell you to get the price down so your volume will go up.... [T]hey literally told you what to price.

Plaintiffs' Exh. 2 at 6–7, 8, 10. Gunderson states:

It started out as suggestions. And then later on it went to some threats.... [Defendant's representative said] if you don't get your price down, then, you know, we can always do things like skip a load on you or certain things like that.

Plaintiff's Exh. 3 at 3.

Plaintiffs also submit the affidavit of Bryan Clough, a former Portland area ARCO Marketing Representative. He states that ARCO management "clearly and forcibly instructed myself and the other marketing representatives to see that the retail dealers priced in accordance with ARCO's policies." Plaintiffs' Exh. 4 at 2 (Affidavit of Bryan Clough). "ARCO representatives were instructed to specifically tell the dealer what

margins he should have for each product and what pool margin he should have." *Id.* at 2.

Defendant relies on excerpts from plaintiffs' depositions to demonstrate that notwithstanding defendant's alleged suggested five cent "pool margin," each plaintiff acknowledged that he was free to set his own margin. Amhaz concedes he sometimes did not follow defendant's suggestions. Defendant's Exh. 1 at 17. He states that he followed ARCO's suggestions ninety percent of the time. *Id.* at 15. Norwood states that he kept his margin between five and one half cents and six cents but did go up to ten cents during the Exxon Valdez oil spill. Defendant's Exh. 2 at 9. Gunderson concedes that he stopped listening to defendant's suggestions and had priced as high as a nine or ten cent "pool margin." Defendant's Exh. 3 at 14–15.

Defendant also submits records showing that each plaintiff's average "pool margin" for 1989 and early 1990 was above five cents. Defendant's Exh. 11 (Amhaz's October 1989 average margin was 6.89 cents and year to date average margin was 7.07 cents; January 1990 average "pool margin" was 10.2 cents); Defendant's Exh. 12 (Norwood's October 1989 and year to date average margins were almost seven cents; December 1989 average margin was just over eight cents, and January 1990 average margin was just over seven cents); Defendant's Exh. 13 (Gunderson's average "pool margins" for November and December 1989 and January 1990 were 7.2 cents, 7.9 cents, and 7.7 cents respectively).

Additionally, defendant points out that in response to the alleged threat made by one of defendant's representatives to Gunderson that he better move his prices down or defendant would take some action, Gunderson did not move his prices down but rather told the representative that defendant couldn't do that and to go ahead and try. Defendant's Exh. 3 at 16. Finally, all plaintiffs conceded that they surveyed their competitors' posted prices to determine their own retail prices. Defendant's Exh. 1 at 13, 18–19; Defendant's Exh. 2 at 10; Defendant's Exh. 3 at 20–21.

■ Plaintiffs' evidence shows that defendant suggested a five cent "pool margin" and attempted to persuade plaintiffs to set their prices accordingly. However, this is not enough to constitute an OMFFA violation. Plaintiffs fall short of proving that defendant deprived them of their free choice to set their retail prices. Each plaintiff conceded that he *did not* always adhere to defendant's suggestions. The records demonstrate that plaintiffs' average margins for the time in question regularly exceeded five cents. There is absolutely no evidence that any plaintiff succumbed to defendant's pressure. There is no evidence that defendant executed its alleged threats on any plaintiff or on any retailer.

■ Though I agree with plaintiffs that coercion in a strict sense is not required, I reject plaintiffs' argument that any interference by defendant with plaintiffs' decision regarding retail prices violates the OMFFA. Plaintiffs' "any interference" test is a hollow standard. Virtually any act by defendant could violate the statute. As discussed above, the issue is whether defendant's actions deprived plaintiffs of their free choice. This standard adequately addresses the crux of the statute because it allows for both direct and indirect means of such deprivation. Plaintiffs have, however, failed to meet the standard.

### B. Statutory Good Faith Provisions

Plaintiffs allege that defendant violated both of the OMFFA's statutory good faith provisions. The first provision, ORS 650.-210(2), provides that it is unlawful for any franchisor to sell, rent, or offer to sell or rent to a franchisee any product, service, or property at a price not set in good faith as defined in ORS 72.1030(1)(b). ORS 72.-1030(1)(b) defines good faith as "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." The second OMFFA good faith provision, ORS 650.245, states that "without limiting the other provisions of ORS 650.200 to 650.250, the principle of good faith shall govern the relationship and dealings of the parties with each other."

### 1. ORS 650.210(2)

Honesty in fact is a subjective test, "looking to the intent or state of mind of the party

concerned." *Community Bank v. Ell,* 278 Or. 417, 427–28, 564 P.2d 685 (1977); *City of Portland v. Berry,* 86 Or.App. 376, 381, 739 P.2d 1041 (1987). The good faith claims are based on plaintiffs' allegations regarding ARCO's raise in wholesale prices to dealers in October 1989 through January 1990. Plaintiffs maintain that ARCO had positioned itself at the low end of the market to attract the price conscious customer. By raising the wholesale price in an attempt to raise the price of motor fuel in the Portland market, plaintiffs contend that defendant violated its duty to act in good faith.

As to its commercial reasonableness, defendant notes that its allowance or freeze on TVA's is premised upon its weekly surveys of retail prices by selected non-ARCO dealers within the applicable price zone. Defendant maintains that the use of temporary price allowances is a common industry practice and thus, it is not unreasonable in the industry. *See In re Coordinated Pretrial Proceedings,* 906 F.2d 432, 436–37 (9th Cir.1990) (explaining pricing policy of Standard Oil Co., Texaco, Inc., Union Oil Co., ARCO, Exxon, Mobil, Shell, and Gulf as consisting of the DTW price minus applicable discounts known as "temporary dealer assistance," "dealer aid," or simply "discounts"), *cert. denied,* —— U.S. ——, 111 S.Ct. 2274, 114 L.Ed.2d 725 (1991).

■ Plaintiffs make no showing that defendant's pricing policy and use of TVA's is commercially unreasonable. As to the honesty in fact prong of this good faith analysis, plaintiffs argue first, that it is inappropriate to resolve this subjective standard on a summary judgment motion, and second, that defendant's rationale for increasing its prices is faulty.

■ I disagree that a subjective issue can never be resolved on summary judgment. Even the case cited by plaintiffs notes that "[t]he question is generally one for the jury *unless only one inference from the evidence is possible." Community Bank,* 278 Or. at 428, 564 P.2d 685 (emphasis added). The question then is whether defendant's raise in prices was honest in fact.

Defendant relies on the affidavit of Harry Johnson, ARCO's Manager of Marketing Volumetrics and Pricing, who states that "ARCO's retail marketing strategy and its pricing policies to ARCO-branded contract and lessee dealers ... were the same throughout 1989 and 1990." Def's Exh. 22 at 2. "ARCO did not deviate from its marketing strategy or pricing policies during the period alleged in plaintiffs' complaint with respect to the Portland, Oregon market or any portion of it, including any price zone in which plaintiffs are or have been located." *Id.* Johnson continues:

DTW price increases and TVA freezes implemented by ARCO during the periods complained of in plaintiffs' complaint were based on ARCO's judgment that competitive brand gasoline prices, which had been increasing for a substantial period prior to October, 1989, would continue increasing. ARCO anticipated that ARCO dealers would be able to pass on higher net dealer buying prices in the form of higher retail prices.

*Id.* at 9–10. Johnson also states that he observed an upward trend in the retail pricing of competitive brands in the latter part of December 1989 which continued into the first weeks of January 1990. *Id.* at 10. In addition, defendant submits evidence demonstrating that the January 1990 freeze on TVA's was implemented in Oregon, Washington, and Northern California and therefore, there is no evidence that defendant was attempting to raise the market in Portland. *Id.* at 8.

Plaintiffs rely on a chart which they argue shows that prices were not increasing but were actually decreasing during the time in question. Plaintiffs' Exh. 8. However, there are several flaws with plaintiffs' evidence. First, because the chart only shows prices beginning October 6, 1989 and continuing through early April 1990, it fails to contradict Johnson's statement that prices had been increasing prior to October 1989 and that defendant thought they would continue increasing.

Second, though a casual glance at the chart might cast doubt on Johnson's statement regarding an upward trend in competitors' retail prices beginning in December 1989, a closer examination reveals that the chart actually shows defendant's net buying price

compared to the average *wholesale* price charged by competitors to their respective dealers. The chart has no information concerning those dealers' retail prices. Though both the net dealer price to defendant's dealers and the competitors' DTW prices decreased from the end of October 1989 until early January 1990, plaintiffs present no information regarding competitors' *retail* prices which is what Johnson states defendant was observing.

Third, while it may be that the net dealer buying prices shown in plaintiffs' exhibit were higher than previously charged by defendant, the chart actually reveals the price decreasing during the majority of the time in question, not increasing. Plaintiffs' complaint challenges an alleged raise in price during this time period. The chart does not support the challenge.

Additionally, aside from a few conclusory statements by plaintiffs that they were harmed by defendant's alleged raise in price, there is absolutely no evidence that plaintiffs lost any volume. Plaintiffs offer no facts to support the assertion that they were damaged. The chart shows that defendant's wholesale prices to plaintiffs ranged from approximately four cents to, for one week, one cent per gallon less than the average wholesale price charged by competitors. Plaintiffs fail to show, for example, that defendant raised its price just for the purpose of gouging, or that defendant put plaintiffs in a losing position by selling to them for one or two cents below the retail or street price of other dealers.

The pricing system is commercially reasonable. Plaintiffs fail to designate specific facts showing an issue for trial regarding defendant's honesty in fact. It appears that defendant raised its prices because of its belief that the market would continue an upward trend. There was no change in defendant's marketing or pricing policy. Thus, plaintiffs' claim that defendant raised its wholesale price in an attempt to raise the price of motor fuel in the Portland market, must fail.

### 2. ORS 650.245

ORS 650.245 does not define "good faith." However, the Ninth Circuit suggests that it is a rule of construction designed to fulfill the reasonable expectations of the contracting parties as they presumably intended. *Pride v. Exxon Corp.,* 911 F.2d 251, 256 (9th Cir. 1990). Essentially, this is the same implied duty of good faith standard first recognized by Oregon courts in *Perkins v. Standard Oil,* 235 Or. 7, 383 P.2d 107 (1963).

In one of the more recent cases interpreting the standard, *Best v. United States Nat'l Bank of Oregon,* 303 Or. 557, 739 P.2d 554 (1987) the Oregon Supreme Court declined to articulate a comprehensive definition of the implied duty of good faith. However, it did state that when a party possesses discretion under a contract, the duty of good faith requires that party to exercise the discretion for purposes contemplated by the parties. *Id.* at 563, 739 P.2d 554.

Defendant notes that each franchise agreement gave ARCO the unlimited discretion to change the price of its motor fuel. Defendant then argues that that right was intended to protect ARCO's "legitimate business interests." Thus, defendant continues, the implied covenant of good faith and fair dealing as codified in ORS 650.245, is breached by an increase in prices only upon proof that ARCO's decision was not premised upon a legitimate business purpose.

Plaintiffs reiterate the same argument made under ORS 650.210(2), that is that defendant's low pricing marketing strategy creates a reasonable expectation on behalf of plaintiffs that defendant's prices would remain lower than those of its competitors and defendant's alleged raise in price violated that expectation. However, as discussed above, plaintiffs fail to show that defendant's wholesale prices were so high that plaintiffs were forced to set their retail prices higher than their competitors' street prices. Plaintiffs also fail to show that defendant changed its marketing strategy in any way. Thus, as with the previous good faith claim, this claim under ORS 650.245 must also fail.

## II. TORTIOUS BAD FAITH CLAIM

Plaintiffs allege that defendant was plaintiffs' "landlord, supplier, business advisor, and the plaintiffs were dependent upon defendant for the success of their business so that there was a special relationship between the parties." Complaint at para. 12. Plaintiffs again challenge defendant's alleged raise in prices as constituting bad faith.

 To prove the tort of bad faith and unfair dealing, plaintiffs must show that a special relationship existed between the parties, that the relationship made the injury from breach of this duty foreseeable, and that the defendant breached this duty to plaintiffs' injury. *Amos v. Union Oil Co. of Calif.*, 663 F.Supp. 1027, 1029 (D.Or.1987). In *Amos* "the parties agreed that there was a type of partnership relationship between Unocal and its dealers. There was evidence from the defendant that it owed a duty to its dealers to be competitive in the market even though no one expected Unocal to match the prices penny for penny." *Id.* at 1029.

Defendant argues that *Amos* limits the tort to partnership relationships that give rise to fiduciary duties. Thus, defendant maintains, because the franchise relationship in the instant case does not amount to a partnership relationship, no special relationship can be proven. Furthermore, defendant argues, plaintiffs cannot claim that defendant acted as their business advisor when, according to defendant, each plaintiff has testified that he made his own decisions regarding his retail prices despite ARCO's suggestions. Defendant maintains that the fact that ARCO is economically stronger than plaintiffs is not, by itself, a basis for finding a relationship of confidence or trust.

There are several District of Oregon cases discussing the tort. In *Seaward Yacht Sales v. Murray Chris–Craft Cruisers*, 701 F.Supp. 766 (D.Or.1988), Judge Frye discussed whether, in a manufacturer—distributor relationship, reliance by the plaintiff on the defendant's alleged promises to give the plaintiff time to develop and market a product, and defendant's alleged encouragement to open a new dealership, constituted the requisite special relationship. She noted that Oregon's recognition of tortious bad faith actions is limited to circumstances where there is a fiduciary or trust relationship. *Id.* at 771. She held that "such reliance and encouragement in the context of a business contract do not by themselves bring Seaward within the tort theory of bad faith." *Id.* Thus, Judge Frye suggested that the typical reliance found in an ordinary business relationship is insufficient to establish a special relationship.

In *Esso Petroleum Canada v. Security Pac. Bank*, 710 F.Supp. 275, 282 (D.Or.1989), Judge Frye held that the defendant did not have "vastly superior bargaining power" over the plaintiff and there was no element of reliance such as in a partnerships, insurance, or franchise agreement. *Id.* at 282. Consequently, she held that plaintiff had not stated a claim for tortious bad faith. Thus, *Esso* implies that if there is vastly superior bargaining power, or a certain degree of reliance in the business relationship carrying an independent duty of care, then the special relationship exists, even if it is the context of a franchisee-franchisor relationship.

 From Judge Frye's decisions, it appears that certain partnership, insurance, or franchise relationships can carry indicia of fiduciary or trust relationships and that when a certain degree of reliance appears in the context of one of these relationships, a special relationship may exist. Thus, in the ordinary business relationship, reliance by one party on another is not enough. In the context of a franchise relationship, an exceptional degree of reliance may be enough.

In a more recent case, Judge Redden noted:

> In the present case, [plaintiff franchisee] testified that the parties had a partnership type relationship in which the franchisee had to trust the franchisor. He also testified, however, that he did not agree with or follow many parts of defendant's program. Though substantial evidence may have demonstrated a disparity of bargaining power, that alone is insufficient under either Oregon or California law. Substantial evidence was not offered showing that the parties had the kind of fiduciary or trust relationship required to sustain a bad faith tort claim in either state. At most,

the evidence showed that the parties had a typical franchise relationship. Such relationships are not, without more, sufficient to support a bad faith tort claim.

*George Hammersmith, Inc. v. Taco Bell Corp.,* CV No. 87–711–RE, slip op. at 14–15 (D.Or. Feb. 22, 1990). Judge Redden granted the defendant's JNOV motion.

 From the above cases, it is clear that franchise relationships should not be categorically eliminated from the requisite special relationships. On the other hand, the typical franchise relationship will not support a special relationship finding. Summarizing all of these cases into a single, workable standard, it appears that there must be either a fiduciary or trust relationship, or, some exceptional degree of reliance in the context of a franchise, partnership, or insurance relationship so that a de facto fiduciary relationship could be found, that is, a relationship where the franchisor has a duty independent of the contract to act for the franchisee's benefit.

 No such relationship exists in this case. Aside from their assertion that they were dependent upon defendant for the success of their businesses, plaintiffs offer no evidence of an exceptional degree of reliance between these parties. To a certain extent, all franchisees are dependent on their franchisors for the success of their businesses. Many franchisors are also suppliers to their franchisees. It is not uncommon for franchisors in some industries to be a landlord to their franchisees. Thus, the fact that defendant was plaintiffs' supplier and landlord is not evidence of exceptional reliance. As discussed in the preceding section, the evidence shows that notwithstanding defendant's suggested five cent "pool margin," plaintiffs' "pool margins" were routinely higher. Therefore, plaintiffs were not exceptionally dependent on defendant for business advice. Thus, plaintiffs fail to show the required special relationship.

## CONCLUSION

Defendant's motion for summary judgment (# 23) is granted.